Commonwealth v. Kenehan et al.

H. A. Scragg, District Attorney, J. B. Jenkins and J. J. Levy, Assistant District Attorneys, for Commonwealth.

C. P. O'Malley and J. F. Gunster, for defendants.

V. D. Rose, F. J. McDonnell and F. D. Mahon, for rule.

MAXEY, J., March 5, 1929.—The questions raised by the motion to quash the indictment to the above number and term relate to seventeen indictments returned by the grand jury for May Sessions, 1928, against members of the election boards in the following districts: City of Scranton, 3rd Ward, 1st District; City of Scranton, 3rd Ward, 2nd District; Borough of Mayfield, 1st Ward, 2nd Ward, 3rd Ward; Borough of Winton, 1st Ward, 1st District; Borough of Winton, 2nd Ward, 1st District.

Altogether there have been indicted thirty-five election officers. The indictments are practically the same in each case.

### History of the indictments.

The history of these indictments is as follows:

By order of court made in December, 1927, the court calendar for 1928 was so arranged that the grand jury to be summoned for April 16, 1928, were placed in charge of Judge Maxey. This grand jury, after completing the routine matters, were allowed to suspend their sessions under an order signed

"By the Court" and made by Maxey, J., with the concurrence of Leach, J., reading as follows:

"Now, to wit, April 23, 1928, it is ordered that the grand jury, summoned for May Term of the Courts of Quarter Sessions and Oyer and Terminer, be not discharged but be held over, subject to the power of the court to call said grand jury into session to dispose of any business properly laid before a grand jury at any regular term, until the grand jury for the next succeeding term is assembled. Meantime, the members of said grand jury for May Term are excused from service until the further order of the court."

This order was made pursuant to the power vested in the judges of the Courts of Quarter Sessions and Oyer and Terminer by the Act of April 27, 1927, P. L. 420.

On May 1, 1928, the following order was signed "By the Court," made by Judge Maxey, with the concurrence of Judge Leach:

"Now, to wit, May 1, 1928, it is ordered that the grand jury, summoned for May Term of the Courts of Quarter Sessions and Oyer and Terminer of Lackawanna County, which grand jury concluded part of its labors on April 23, 1928, and which grand jury was, by formal order of court filed said date, held over, subject to the power of the court to call said grand jury into session to dispose of any business properly laid before a grand jury at any regular term, is now called to assemble in session in court-room number three of the Lackawanna County Court House, Scranton, Pa., on Thursday, May 3, 1928, at 10 A. M., to receive further instructions from the court and to dispose of any business properly laid before said grand jury.

"Certified copies of this order shall be served on each member of the grand jury by the clerk of the jury board forthwith, and service may be made by mailing these copies to the members of the grand jury by registered letter."

Pursuant to this order, the grand jury reassembled on May 3, 1928, at which time the judge in charge of the grand jury, to wit, Maxey, J., charged the grand jury to investigate election frauds which it was alleged were committed in the spring primary of 1928. The grand jury proceeded to carry out the instructions of the court by summoning witnesses and counting ballots and examining the election returns from certain districts in which it was alleged that fraud had been committed.

On May 10, 1928, the grand jury reported to the court the result of their investigations as to the two districts of the 3rd Ward of Scranton and the three wards of Mayfield, above referred to, and formally presented for indictment the defendants whose names appear in said presentment and in indictments now under consideration. The court, upon reading the report presented by the grand jury, made the following order:

"And now, to wit, May 10, 1928, it is ordered that indictments be drawn and laid before the grand jury for action in conformity with the presentments within made."

Later, on the same day, the grand jury returned true bills against the defendants named.

On May 15, 1928, the grand jury made a similar presentment as to the two districts in the Borough of Winton, above referred to, and the court made an order similar in form to the order above quoted. Later, on this same day, May 15, 1928, the grand jury returned true bills against the defendants named.

The defendants in each case are charged in one indictment with conspiracy to violate election laws, and in another indictment with election frauds therein specified.

*Defendants' first proposition.*

The defendants have filed motions to quash the indictments in all these cases, setting forth twenty or more reasons for quashing. Many of these reasons are so palpably without merit as to require no discussion. The reasons on which the defendants apparently chiefly rely for the quashing of these indictments are as follows:

14. "Said indictment is based upon the testimony of witnesses who appeared before the grand jury and whose names are not endorsed upon the back of said indictment."

15-c. "Said indictment is illegal and void because it is based on an illegal presentment."

The basis of these reasons, it appears from the oral argument in this case, is the fact that the witnesses who appeared before the grand jury on its investigation made pursuant to order of court were sworn by the foreman of the grand jury and not in open court by a judge. The first and main question for us to consider is whether or not this was an irregularity, and, if so, was it such an irregularity as demands the quashing of the indictments.

It is conceded that at common law all witnesses who appeared before the grand jury had to be sworn in open court by a judge and then sent before the grand jury; but the proposition of the defendants that the swearing of the witnesses by the foreman of the grand jury was such an irregularity as to invalidate the indictments founded upon the presentment and return is based upon two errors, as follows: First, that the common law method of swearing witnesses in open court by a judge to testify before the grand jury has not been entirely superseded in Pennsylvania in all cases (that is, in investigations by grand juries pursuant to order of court as well as in ordinary cases based upon transcripts of justices) by the modern method of swearing witnesses by the foreman of the grand jury. Second, that an improper manner of swearing witnesses before a grand jury would at common law invalidate an indictment.

We will discuss the second error first. This error is based upon the untenable theory that the rules of evidence apply as rigorously to proceedings before the grand jury as to proceedings in court. This is incorrect. It is only in exceptional cases that incompetent testimony is held to be sufficient to quash an indictment founded in whole or in part upon such testimony.

Proceedings before a grand jury at common law were much more informal than proceedings before a trial jury. The grand jury at common law consisted of a body of "the first gentlemen of the county" (Blackstone) summoned by the king's justices on circuit to indict (*i. e.*, to "point out") any person in the bailiwick who ought to be called before a jury of his peers to stand trial on any accusation made.

It is conceded that in Pennsylvania certain formalities (most of them originating in the mind of some Quarter Sessions judge) have come to attend the functioning of the grand jury which were not at all required by the common law. But since the defendants invoke the common law practice of having all witnesses who went before the grand jury sworn in open court before a judge, it is a sufficient answer to say that at common law such a departure from the customary method of swearing witnesses would not have been held sufficient ground for quashing an indictment.

As was said by John Kinghorn in a learned article in 6 Law Magazine & Review, London, England (4th series), 367, on "The Growth of the Grand Jury System" (page 389):

"The grand jury being a secret tribunal, whose office is simply to frame accusations, and possessing no powers, nor having cast on it the duty of trying those against whom bills are presented, is not of course bound by any of the rules of evidence applicable to the proceedings of tribunals for the trial of the guilt or innocence of the accused. They may, therefore, avail themselves of any sources of information that come within their reach and act upon them or not, as they think fit; they may even read a paragraph from a newspaper (per Byles, J., Reg. v. Bullard, 12 Cox C. C. 353); look at the depositions of absent witnesses without any proof that they were regularly taken (per Denman, J., Reg. v. Gerrans, 13 Cox C. C. 158); or trust to mere public rumor for the purpose of finding bills. Such indictments are perfectly good, and according to the practice, both of this country and of America, are not vitiated by the fact that the grand jury have received evidence that would be irrelevant or incompetent on the trial of the indictment (Hope v. The People, 83 N. Y. Court of Appeals, 418).

"It has also been held by Lord Denman and Wightman, Judge, on the Northerly Circuit, that an incorrect mode of swearing witnesses to go before the grand jury would not vitiate the indictment, as the grand jury were at liberty to find a bill upon their own knowledge merely, a ruling subsequently followed by Gurney, B., in Reg. v. Russell, Car. & Marsh. 247."

Forsythe, "Trial by Jury," page 215: "When the justices in eyre paid their periodical visits to the counties they caused to be summoned before them twelve knights or other good and lawful men for each hundred, and charged them upon their oaths to inquire respecting crimes and offenses committed within their respective hundreds so that they might be ready to present to the court the suspected persons at a future day fixed by the justices. These jurors were the representatives of and substitutes for the fama patriæ, or public rumor, by which in old times when a man was assailed he was said to be mala creditas and was thereupon arrested and put upon his trial."

Thompson & Merriam on Juries, § 463: "An accusing body . . . has been known to the law from the time of Henry III. . . . Each hundred had its own accusing body. No witnesses were examined. Presentments were made on the knowledge of the jurors."

The same authors state (section 467) that originally the grand jury was merely an accusing body; no witnesses were sworn; the presentments were made upon the knowledge of the jurors in respect to any such violations of law as were the subject of their inquiry.

In the case of Regina v. Russell, 41 English Common Law Reports, 139, s. c., 1 Carrington & Marshman, 247, the question arose as to whether or not the witnesses had been properly sworn by the grand jury. "Gurney, B., and Wightman, J., were both of opinion that that was a matter which they ought not to inquire into; and also that the mode of swearing the witnesses to go before the grand jury would not, if incorrect, vitiate the indictment, as the grand jury were at liberty to find a bill upon their own knowledge merely and were anciently in the habit of doing so. And Wightman, J., added that the same point had arisen lately on the Northern Circuit, before Lord Denman and himself, and they, after considering the subject, were of the same opinion as had been expressed today."

Reg. v. Bullard (Suffolk Spring Assizes, 1872), 12 Cox. Crim. Law Cases, 353 (14 English & Empire Digest, page 239, par. 2270). Bullard was charged with unlawfully and maliciously wounding one Cooper. The foreman of the grand jury came into court and asked for the deposition of an absent witness, without whose evidence they had no materials to find a bill. Beyles, J.,

granted the application and said that the grand jury were not bound by any rules of evidence. "They were a secret tribunal and might lay by the heels in jail the most powerful man in the country by finding a bill against him, and for that purpose might even read a paragraph from a newspaper."

14 English & Empire Digest, page 238, § 2258: "When the grand jury have found a bill, the judges before whom the case comes to be tried ought not to inquire whether the witnesses were properly sworn previously to their going before the grand jury. *Semble:* An improper mode of swearing them will not vitiate the indictment, as the grand jury are at liberty to find a bill upon their own knowledge merely." Citing Regina *v.* Russell (1842), Car. & Marsh. 247.

Hale *v.* Henkel, 201 U. S. 43, Brown, J. (page 60):

"The oath administered to the foreman, which has come down to us from the most ancient times, and is found in Rex. *v.* Shaftsbury, 8 Howell's State Trials, 759, indicates that the grand jury was competent to act solely on its own volition. This oath was that 'you shall diligently inquire and true presentments make of all such matters, articles and things as shall be given to you in charge, as of all other matters and things as shall come to your own knowledge touching this present service,' etc. This oath has remained substantially unchanged to the present day.

"In a lecture delivered by Mr. Justice Wilson, of this court, who may be assumed to have known the current practice, before the students of the University of Pennsylvania, he says (2 Wilson's Works, 213):

"'It has been alleged that grand juries are confined, in their inquiries to the bills offered to them, to the crimes given them in charge, and to the evidence brought before them by the prosecutor. But these conceptions are much too contracted; they present but a very imperfect and unsatisfactory view of the duty required from grand jurors, and of the trust reposed in them. They are not appointed for the prosecutor or for the court; they are appointed for the government and for the people. . . .

"'The oath of a grand jury man—and his oath is the commission under which he acts—assigns no limits, except those marked by diligence itself, to the course of his inquiries. Why, then, should it be circumscribed by more contracted boundaries? Shall diligent inquiry be enjoined? And shall the means and opportunities of inquiry be prohibited or restrained?'"

This language of Justice Brown would seem to indicate that the courts of the United States recognize the common law doctrine, so clearly recognized in England, that the evidence on which the grand jury may base their presentment on a matter given to them in charge is not limited to evidence elicited from witnesses sworn before a judge in open court, and that in the "diligent inquiry" which they are sworn to make they may avail themselves of any sources of information.

That the courts of Pennsylvania do not require grand juries in their proceedings to conform literally to technical requirements, at the peril of having their indictments quashed, is indicated by the case of Com. *v.* Brown, 23 Pa. Superior Ct. 470. This is a lengthy report, and we will refer to other features of this case in another part of our opinion. We wish now to call attention to the fact that in this case, as reported on page 498, the language of Rice, P. J., was: "The indictment purported to be signed by the district attorney; as matter of fact, his signature was affixed thereto by his express direction; the district attorney, in person, laid the bill thus signed before the grand jury, and by other unequivocal acts avowed his individual and official responsibility therefor. In view of these facts, we are unable to conclude

that the court erred in refusing to quash because the signature was not written with his own hand. At the same time, we are not to be understood as commending the practice, much less as holding that the duty of signing bills of indictment, imposed upon district attorneys by the Act of May 3, 1850, P. L. 654, may be effectually performed by a clerk, or even a deputy, under a general authorization by the district attorney to sign his name. We overrule the assignment upon the special facts above set forth."

Here is a case in which the express requirement of the statute was departed from when the indictment was not signed by the district attorney, as the statute declares it must be, but by a member of his staff. Yet, in spite of this violation of a plain statutory mandate, the court below refused to quash the indictment, and said refusal was sustained by the Superior Court.

State v. Fasset, 16 Conn. 457, was a case in which the witnesses before the grand jury were not sworn by an officer of the court in open court, but were sworn by a magistrate in the grand jury room. Chief Justice Williams (page 463) says: "The practice in England, and in the courts of the United States, certainly is, that the witnesses should be sworn in open court; growing probably out of the fact that formerly grand juries met with the court, and the proceedings seem to have been carried on under the eye of the court. . . ."

Chief Justice Williams then relates how the practice had grown up in Connecticut of having the grand jurors sworn by a magistrate in the grand jury room. He says:

"So far as we are informed, no witness has ever been sworn in our courts and sent to the grand jury for examination.

"A practice so ancient and so uniform, growing up under the eyes of the court, is certainly strong evidence of what is the law. If the law requires every witness examined by the grand jury to be sworn in court—is it possible that when it must have been known almost necessarily to court and counsel, in the numerous cases in which indictments have been found, that witnesses were not sworn in court—that no lawyer and no judge should have ever before doubted the legality of these indictments?"

In re Kennedy, 78 Pac. Repr. 34:

"The sufficiency of the evidence before a grand jury to warrant the indictment found by it cannot be inquired into on *habeas corpus*, though it was taken down by a stenographer as authorized by Penal Code, § 925, as amended by Stat., 1897, ch. 142, page 204.

"We cannot look to the sufficiency of the evidence on which it acted, for as to that matter its action is conclusive."

Noll v. Dailey (W. Va.), 79 S. E. Repr. 668; 47 L. R. A. (N. S.) 1207, Williams, J. (page 1209): "According to our judicial system, they (the grand jury) are the tribunal representing the people for the purpose of charging crime and designating the criminal. The evidence that satisfies them that probable cause exists for the prosecution of a certain person for a designated crime might not be enough to satisfy the court or a petit jury; and to permit the court to inquire into the legality or sufficiency of the evidence on which the grand jury acted would be to substitute, in a measure, the opinion of the court for that of the grand jury, and would ultimately lead to the destruction of the grand jury system. Such proceeding would also furnish opportunity for long and unnecessary delay in the trial of criminal cases, and would be a useless encumbrance upon criminal procedure. . . . If it is made to appear that the indictment was found either upon illegal evidence or without any evidence, and the state produces no other evidence at the trial than what was

before the grand jury, the prisoner will be vindicated as fully by an acquittal as he would be by quashing the indictment. It would be very bad practice— endless inconvenience—to have a full preliminary trial of competence of evidence before the grand jury in many cases. How far would the practice go?"

We are satisfied from a review of the history of the grand jury and the methods of procedure at common law and the authorities cited that even if the swearing of the witnesses by the foreman of the grand jury instead of by a judge in open court constituted an irregularity, it would not be such an irregularity as would move the court to quash the indictment.

However, this method of swearing witnesses is not an irregularity, but is the accepted practice in Pennsylvania.

In the case of Com. v. Brown, 23 Pa. Superior Ct. 470, already referred to, it appears (page 495) that the proceedings originated as follows:

"It was developed on the hearing of the motion to quash that there had been an investigation of the charges which are the subject-matter of the bill by a committee appointed by the Board of Public Education (of Philadelphia) ; that the committee had reported that certain members of the Board of Directors of the 28th Section and one or more other persons required and received from teachers, or from their families or friends, money for services and votes attending the appointment or placing of teachers in the public schools in that section; that, pursuant to a resolution of the Board of Public Education, a communication reciting the above facts and accompanied by a copy of the testimony taken before the investigation committee was placed in the hands of the district attorney for his consideration and action; that, after an examination of this testimony and other investigation, the district attorney deemed the matter of sufficient public importance to warrant him in preferring this and other bills before the grand jury; that thereupon the bill was prepared by his assistants under his direction and supervision, and the district attorney's name subscribed thereto by his clerk by express direction of the former; that the district attorney took the bill to one of the judges of the court and stated the result of his investigation. We now quote his language: 'Judge Beitler agreed with me that the matter was of sufficient public importance to prefer the bills, and authorized me, and in fact directed me, to send those bills before the grand jury. . . .' On the back of the bill appears this indorsement: 'Presented to the grand jury by district attorney by authority of A. M. Beitler, Judge;' but it is not alleged that this indorsement was written by the judge or was placed on the indictment by his express direction. We have referred to the action of the Board of Public Education and its committee, not with a view of suggesting, much less holding, that the investigation conducted by them was the legal equivalent of a hearing before a committing magistrate—for it was not—but for the purpose of showing that the district attorney did not act hastily, inadvisedly or arbitrarily, or exercise his power to proceed in this way in order to suit the mere pleasure or convenience, or gratify the caprice or malevolence, of any private individual. That the district attorney may prefer a bill of indictment without a previous binding over or commitment of the accused is well settled; but the exercise of this extraordinary power is always subject to the supervisory control of the court. . . . 'In practice, . . . the law officer of the Commonwealth always exercises this power cautiously; generally under the directions of the courts, and never unless convinced that the general public good demands it:' Per King, P. J., in Lloyd and Carpenter's Case, 3 Clark, 188. Where the court sanctions and approves it, and a motion to quash is refused,

the appellate court will not reverse unless there be an abuse of discretion, 'both manifest and flagrant:' Rowand *v.* Com., 82 Pa. 405. . . ."

It appears further in this case (page 480) that among the reasons assigned for quashing the indictment in this case was the following: "Because there was no presentment by the grand jury made from personal knowledge or from the testimony of witnesses sent before them by the court."

This reason in substance is the same reason that the defendants stress in the cases before us. In the Brown case, the court below overruled the motion to quash without filing an opinion. Apparently the action of the court in overruling the motion was acquiesced in by the learned counsel for the defendants in that case, to wit, A. S. L. Shields, W. W. Porter and John Monaghan (now District Attorney of Philadelphia County), for the refusal to quash on this ground was apparently not argued before the Superior Court. The conviction in the court below was sustained, all the assignments of error were overruled by the Superior Court and the judgment as to each defendant was affirmed..

Furthermore, the precise question raised in this case as to the method of swearing witnesses was decided by President Judge Swearingen, of Allegheny County, in 1910, in the case of Com. *v.* Hoffstot, 58 Pitts. L. J. 379. In that case the defendant was indicted for conspiracy, and a motion was made to quash the indictment on the ground, *inter alia*, that "Witnesses were called and testified before the grand jury which found the indictment whose names are not marked upon the indictment."

This is exactly what happened in the case at bar. Judge Swearingen says (page 382):

"It is urged that the witnesses before the grand jury were not legally sworn, because the foreman had no power to administer the oath to them, and because, after the presentment, they were not resworn when the indictment was found.

"Prior to the Act approved April 5, 1826, P. L. 204, witnesses who testified before a grand jury were sworn in open court, as at common law. Then said statute was enacted. It is entitled 'An act to enable grand jurors to administer oaths or affirmations to witnesses,' and it provides that:

" 'The foreman of a grand jury, or any member thereof, be and they are hereby authorized and empowered to administer the requisite oaths or affirmations to any witness or witnesses whose names may be marked by the Attorney-General on the bills of indictment.'

"This statute was substantially re-enacted in the Code of Criminal Procedure, and it is found in the 10th section of the Act approved March 31, 1860, P. L. 427, which is as follows:

" 'The foreman of any grand jury, or any member thereof, is hereby authorized and empowered to administer the requisite oaths or affirmations to any witness whose name may be marked by the district attorney on the bill of indictment.'

"Does this statute mean that a grand juror has no power to administer oaths or affirmations to any witness except those whose names the district attorney shall have marked upon technical indictments—such as have been drawn on informations previously made before magistrates—as contended by the defendant? Or does the statute mean that a grand juror has power to administer oaths or affirmations to any witnesses lawfully brought before the grand jury in any lawful investigation then pending before it, as contended by the Commonwealth? . . .

"There can be no doubt that the grant of power contained in the legislation aforesaid is ample to sustain the contention of the Commonwealth. It enables the grand jurors to administer oaths to witnesses—not merely to some witnesses, but to all witnesses. This proposition is supported by the title of the Act of 1826, to which we may look, although it is no part of the act itself. Is the power thus granted restricted by the last clause of the statute, to wit, 'whose names may be endorsed,' etc., or is that clause to be interpreted as directory to the district attorney?

"The Act of 1826 was an enabling act. There were sound reasons for making the changes in the manner of administering oaths to witnesses who were to appear before the grand jury. The purpose was to avoid the necessity of interrupting the proceedings of the courts while such witnesses were being sworn. Of course, if the court were not actually sitting, the witnesses could not be sworn at all. Thus confusion and delay resulted in the public business. Besides, witnesses could not be sworn in the presence of the grand jury. How, then, could it know whether or not all witnesses had been actually sworn? Thus the grand jury might often act upon unsworn testimony. In an important county like Allegheny the confusion, delay and uncertainty just enumerated might frequently be very serious. Hence, this statute was enacted. This intent was to confer a power upon grand jurors in order to remedy a mischief, and the statute ought to be construed so as to effectuate that intent.

"If the defendant's construction of this statute prevails, we are unable to see how the mischief which it was the intention to remedy will be avoided. At common law it was not necessary that the names of witnesses who appeared before a grand jury should be endorsed upon an indictment. . . . Certainly the legislation under consideration does not require such endorsement. Neither does any other statute to which our attention has been called. Hence, the names of witnesses are not required to be marked upon an indictment at all. If this be true, then it is discretionary with the district attorney whether or not he will mark any or all the names on an indictment; and the witnesses to an ordinary indictment must in some instances still be sworn in open court and likewise all witnesses in other investigations by the grand jury. Grand jurors are not learned in the law. They cannot determine when the power conferred by the statute could or could not be exercised. Thus the same confusion, delay and uncertainty would result as the said legislation sought to avoid. It is hardly reasonable to suppose that the legislature undertook to cure a mischief by granting a power and then, by a limitation or restriction of the grant, preserved the very mischief it had undertaken to suppress. Plain language is necessary to accomplish that result. Yet, such is the result, if the court is still required to be interrupted and delayed while some witnesses who are to go before the grand jury are being sworn. Considering, therefore, the old law, the mischief and the remedy, it seems to us that the power to administer oaths, conferred upon grand jurors by the statute, was not intended to be restricted in the manner claimed by the defendant.

"The clause of the statute under consideration is relative in form. Such a clause may be either restrictive, that is, used to define some word in the principal clause, or it may be non-restrictive, that is, used to add some thought to the principal one already expressed. Usually the test is, can the words 'and it' or 'and their' be substituted for the relative pronoun? If so, the clause is non-restrictive. Applying that test to this statute, the substitution can be made, and it would then read '. . . to witnesses and their names may be

endorsed,' etc. Clearly this would be non-restrictive of the grant of power in the principal clause of the statute. Besides, the words 'may be' are used—not 'must be' or 'shall have been.' The word 'may' usually imports permission, not obligation. There is nothing in this statute which indicates that the word 'may' was intended to have any other than its ordinary meaning. And so this construction indicates that the clause of the statute aforesaid is not restrictive of the authority to grand jurors therein previously granted. . . .

"In this case, the grand jury was, under order of court, lawfully engaged in an investigation of subjects of great public moment. Witnesses were lawfully called before it in aid of that investigation. We have just held that they were all lawfully sworn. Thereupon the grand jury returned a presentment to the court, and, upon that, the court directed the district attorney to lay an indictment before the grand jury, which was done the same day. What was the necessity of again calling the same witnesses, again administering the oath to them and again having them testify to the same effect as they had already done? . . .

"As authority, we refer to the well-considered opinion in State v. Hawks, 56 Minn. 129. In this case, it was said that the proposition of the defendant, similar to the one here made, leads to this:

" 'That, upon a motion to set aside an indictment on the ground that the names of witnesses are not endorsed, a defendant may go into a general fishing expedition through the entire proceedings of a grand jury and make them public, for the purpose of ascertaining what witnesses have at any time during the session, in the investigation of any case, given testimony material to the charge in the indictment. This would involve not only the reproduction of the evidence on the motion but also the determination of the court as to its materiality upon the charge in the indictment. Indeed, we do not see why it would not require the court to go further and enter into the minds of the grand jurors to ascertain whether they took the evidence into account when finding the indictment. Any such course would be utterly incompatible with the orderly or prompt dispatch of public business, and any proposition which leads to any such results cannot be sound.' "

In Com. v. Dietrich, 7 Pa. Superior Ct. 515, the Superior Court, in an opinion by its then President, Judge Rice, said (page 520) that in cases of investigations by grand juries made pursuant to an order of court "the oath may now be administered by the foreman of the grand jury." Judge Rice made the same statement in the case of Com. v. Klein, 40 Pa. Superior Ct. 352, 357. The defendants argue that in each case this statement by Judge Rice was mere *dictum* because the precise question was not involved in those cases. The answer to that is that if it is *dictum*, it is *dictum* that is entitled to the greatest respect and it should be followed by the subordinate courts until it is expressly everruled by the appellate courts. We know of no case in which this so-called *dictum* of Judge Rice has been overruled or even challenged. This practice which President Judge Rice, speaking for the Superior Court, sanctioned is the practice followed in the four largest counties of the State, Philadelphia, Allegheny, Luzerne and Lackawanna; and we know of no county in which it is not followed.

### The evidence of custom.

It is well settled that a custom long acquiesced in constitutes some evidence as to what the law is. It is apparently the custom in this Commonwealth for the foreman of the grand jury to swear witnesses when investigations are being held by the grand jury under the direction of the court. As to the first

proposition, that custom becomes evidence of the law, we cite the opinion of the Supreme Court of Pennsylvania in McCalmont v. Allegheny County, 29 Pa. 417, 419, as follows: "There is no statutory provision directing how these expenses shall be paid, and it is not necessary that there should be, for the usage is sufficient to make the law." See, also, Allegheny County v. Watt, 3 Pa. 462.

"Custom is the best expounder of the law. . . . The usage of a court becomes somewhat the law of the court:" Donnell v. Wright, 97 S. W. Repr. 928, 931.

"Customs have sprung from the necessities and the convenience of business and prevailed in duration and extent until they acquired the force of law. This mass of our jurisprudence has thus grown, and will continue to grow, by successive accretions:" Merchants' National Bank v. State National Bank, 10 Wall. (77 U. S.) 604, 651.

"A custom so long persisted in as to be known and practiced by a community is the law of the particular business in which it exists:" Adams v. Pittsburgh Ins. Co., 95 Pa. 348, 356.

"Custom is that length of usage which has become law. It is a usage which has acquired the force of law: Bouv. Law Dict. . . ." Walls v. Bailey, 49 N. Y. 464, 471; 10 Am. Rep. 407.

Pennsylvania has its own common law as well as the common law it has derived from England, and the practice of having witnesses who appear before the grand jury upon investigations sworn by the foreman of the grand jury may properly be considered, on account of its universality, a part of the common law of Pennsylvania.

12 Corpus Juris, 177: "The common law in the United States, that is, in the several states, consists of the common or unwritten law of England as it existed in 1607 when the colonists from England settled in America, or in some states at a later date, in so far as that law is applicable to the new surroundings and conditions and has not been abrogated by statute."

Page 178: "The unwritten or common law is the embodiment of principles and rules inspired by natural reason, an innate sense of justice and the dictates of convenience and voluntarily adopted by men for their government in social relations. The authority of its rules does not depend on positive legislative enactment, but on general reception and usage and the tendency of the rules to accomplish the ends of justice. The common law is not fixed and immutable, except by positive enactment, like the statute law, but is flexible, so that it is always adapted to meet new and unexpected conditions and so that its principles will cease to apply when the reason on which they are founded ceases."

Page 188: "The common law of England is not in all respects the common law of America and does not prevail in the various states in the identical manner in which it is in force in England, and the common law of one state is not necessarily that of another, as each state adopts such parts as are desirable and suitable to its needs. When circumstances and conditions are naturally different, the courts will not hesitate to make such modifications as the situation requires."

That it is the practice in Pennsylvania to swear witnesses by the foreman of the grand jury in investigations conducted by the grand jury pursuant to the order of court is evidenced as follows:

George S. Graham, who served for fifteen years as District Attorney of Philadelphia County, recently informed us that during his term of office as district attorney, and at all times, so far as he is aware, the witnesses called

before the grand jury conducting an investigation in Philadelphia County were sworn by the foreman or by a member of the grand jury. We were recently given similar information by Judge Thomas D. Finletter, who served for eighteen years as First Assistant District Attorney of Philadelphia County. We have also recently been informed by Assistant District Attorney Barr, who, with District Attorney Monaghan, has been conducting an investigation before the grand jury of Philadelphia County since August, 1928, that the witnesses called before said grand jury have been sworn by the foreman of the grand jury, and that this has long been the custom in Philadelphia County.

President Judge John A. Evans, of Allegheny County, states in a letter to us dated Feb. 28, 1929: "In somewhat over thirty years I have been on the bench witnesses before the grand jury are not sworn in open court. They are sworn, I presume, by the foreman of the grand jury, although I cannot testify to that because I have never been before the grand jury."

During the six years that we were District Attorney of Lackawanna County there were several investigations conducted by the grand jury, and in every instance the oath was administered to the witnesses by the foreman of the grand jury. This has always been, and still is, the custom in this county.

We are informed by Judge Jones, of the neighboring County of Luzerne, who also served as district attorney, in a letter dated Feb. 21, 1929: "It has always been the custom for the foreman of the grand jury to swear the witnesses. I have no doubt about that practice."

### Conclusion.

Our conclusion on this branch of the case is that under the Act of March 31, 1860, P. L. 427, as interpreted by the courts of Pennsylvania, the foreman or a member of the grand jury in all cases of investigations pursuant to order of court, as in all other cases, has the right to administer oaths to witnesses appearing before the grand jury.

Our conclusion is, further, that, regardless of the Act of 1860, the foreman of the grand jury has the right to administer oaths to witnesses appearing before the grand jury upon investigations as in all other cases, this right being based upon immemorial custom so long acquiesced in by the various Courts of Quarter Sessions and Oyer and Terminer of Pennsylvania as to become a part of the common law of Pennsylvania.

Our conclusion is, further, that, even if the right of the foreman to swear witnesses appearing before the grand jury upon investigations were doubtful, as we now expressly hold that it is not, the swearing of witnesses by the foreman would not constitute such an irregularity as at law would justify us in quashing these indictments, for, according to the prescriptions of the very common law which the defendants invoke, an incorrect method of swearing witnesses before the grand jury would not vitiate an indictment founded upon the testimony of such incorrectly sworn witnesses.

We, therefore, hold that reasons Nos. 14 and 15-c, advanced by defendants in support of their motion to quash the indictments, upon which reasons defendants seem to chiefly rely, are totally without merit.

### Defendants' second proposition.

The second proposition stressed by the defendants in the case at bar was, as set forth in the seventh reason in support of the motion to quash, as follows:

"The alleged grand jury which found said indictment, as well as all proceedings thereof, are illegal and void, for the reason that the clerk of the jury board did not announce or advertise the time and place of the drawing of said grand jurors in two newspapers of general circulation in the City of Scranton, County of Lackawanna and State of Pennsylvania, not more than ten days nor less than three days before the time of said drawing, as required by section 6 of the Act of 1925, P. L. 244."

This provision of the act is clearly directory and not mandatory.

25 Ruling Case Law, 767: "Generally speaking, those provisions which do not relate to the essence of the thing to be done and as to which compliance is a matter of convenience rather than substance are directory, while the provisions which relate to the essence of the thing to be done, that is, to matters of substance, are mandatory."

Page 771: "Provisions in tax laws intended to promote dispatch, method, system and uniformity in modes of proceeding are usually deemed to be merely directory; but those intended for the protection of the citizen and to prevent a sacrifice of his property are mandatory."

Page 773: "Irregularities in the conduct of elections, such as neglect of inspectors or clerks to take the prescribed oath or to take it in a formal manner, errors in the spelling of names of candidates on ballots cast, action of unauthorized persons (without fraudulent intent) as inspectors, and the like, do not avoid the election or impair the title to the office of the candidate for whom the majority of votes was actually and intentionally cast."

Page 774: "Failure of the sheriff to give notice of an execution sale as provided by law does not vitiate the sale, such statutes being regarded as directory only and not mandatory."

Erie City v. Willis, 26 Pa. Superior Ct. 459: "The provisions of section 35 of the Act of May 16, 1901, P. L. 224, that at least five days' notice shall be given of the time and place of making assessments for the cost of local improvements is directory and not mandatory."

Jones v. Vail, 5 Lacka. Jurist, 257, Kelly, J.: "The requirements of the law as to advertising and giving notice of sheriff's sales are merely directory, and the validity of a sale does not necessarily depend upon a strict compliance with them. . . . The notice of sale in the Lackawanna Jurist was published for two full weeks instead of three; and while this was an irregularity, it was not fatal to the validity of the sale."

Hill v. Mervine, 5 Lacka. Jurist, 182: "Section 8 of the Act of April 19, 1901, P. L. 88, relating to the affidavit of value in replevin, is directory, and failure to file said affidavit where a sufficient bond has been entered is not a sufficient reason for quashing the writ."

Com. v. Valsalka, 181 Pa. 17, syllabus: "A judgment on a verdict of guilty of murder in the first degree will not be arrested on the ground that the grand jury had been selected by jury commissioners who had not taken and filed in the office of the prothonotary the oath of office prescribed by article VII, section 1, of the Constitution, where it appears that the commissioners had taken, reduced to writing and signed, the oath of office before the deputy recorder in his office and had there left it before the beginning of their official terms."

Com. v. Zillafrow, 207 Pa. 274, 277, Mitchell, C. J. (page 277): "The statutory provisions alleged to have been disregarded, though not followed literally, were not contravened as to spirit or intent. The provisions themselves are directory in character. They do not prescribe or bear upon the substance of any duty, but merely upon the manner of its performance, and

do not differ in this respect from other provisions of the same or analogous acts which have already been held to be directory only."

Bladen v. Philadelphia, 60 Pa. 464, syllabus: "Words of a statute which are affirmative and relate to the manner in which power or jurisdiction vested in a public officer or body is to be exercised, and not to the power itself, may be construed directory."

Rolland et al. v. Com., 82 Pa. 306, syllabus: "The names of jurors exempted from service at a previous term were not returned to the wheel by the sheriff and jury commissioners at the time the jury in question was drawn, as required by section 135 of the Act of April 14, 1834. Held, not to be a ground of challenge."

Clark v. Com., 29 Pa. 129, 136, Woodward, J.: "The 88th section of the Act of April 14, 1834, relating to juries, requires the name, surname, addition or occupation of jurors to be given, but this only for the purpose of identification. The provision is directory merely."

The provision in section 6 of the Act of April 16, 1925, P. L. 244, that "the clerk shall announce or advertise the time and place of said drawing of jurors in two newspapers of general circulation, all of which shall be located in the county seat of the county, not more than ten days nor less than three days before the time of said drawing," was inserted merely to give citizens who might wish to attend the drawing of jurors an opportunity to be present. The writer of this opinion ought to have knowledge of this fact because he was the author of the Act of April 16, 1925. But the act throws ample safeguards around the drawing of jurors even without the presence of the public. In the first place, the drawing of jurors is in one of the court-rooms, at a time and place of which all the members of the jury board have notice. The drawing is in the presence of at least one jury commissioner and at least one judge of the Court of Common Pleas. It is open to the public. The name-slips are drawn from the wheel by the person whom the judge or judges present at the drawing then and there appoint for the purpose; and the name, number, address and occupation as the same appear on these name-slips are read by another person then and there appointed by the judge or judges present and are immediately compared by the clerk of the jury board with the corresponding name, number, address and occupation on the official jury list.

These provisions obviate all possibility of any fraud in the drawing of the jury. So confident is the public in the integrity of the jury drawings under this Act of 1925 that in the last year or two, even though the drawing of jurors was announced or advertised in newspapers, it happened frequently that no citizen appeared other than the judges and other members of the jury board and the court attachés, and it is most unusual to have more than two or three citizens appear at these drawings. The object sought to be accomplished by the drafting and the securing of the enactment of the jury bill of April 16, 1925, to wit, to have an honest filling of the jury wheel and an honest drawing of jurors, has been fully accomplished, regardless of whether the drawing of jurors has each time been advertised or announced as the jury bill directs.

Furthermore, even if the above-quoted provision of the Act of 1925 be construed as mandatory and not directory, the defendants are too late in making their motion to quash by reason of any fraud or irregularity in the selection of said grand jurors. Section 9 of said act provides: "Any objection or challenge to jurors based on their disqualification for jury service under this act, or to the array based on any irregularity in the proceedings or procedure in and by which said jurors were selected, drawn or summoned for jury service,

must be made before said jurors or array of jurors are sworn and cannot be made thereafter. After jurors are sworn without objection, all objections to their qualifications as prescribed by this act, or to the manner of their selection, drawing or summoning, shall be deemed to have been waived. No indictment can be attacked or verdict challeneged by reason of any juror's disqualification under this act, or any irregularity in the manner of selecting, drawing or summoning jurors, unless due objection is made before said alleged disqualified or illegally selected jurors are sworn."

It is argued that the defendants, not having been under arrest at the time that the grand jury were sworn, had no opportunity to challenge the regularity of the drawing of this grand jury. This argument is not sound. The grand jury are drawn at least thirty days before they are sworn. Any citizen knowing of any irregularity has the right to challenge the array. The fact that no citizen not under arrest would be likely to challenge the array is immaterial. The act plainly says that any objection or challenge to the array must be made before said jurors are sworn. Therefore, no citizen of Pennsylvania has any more rights as to challenging grand jurors than are given under this act, unless the Constitution of Pennsylvania contains some provision which this act breaches, and we know of no such provision.

We, therefore, hold that the seventh reason advanced by defendants in support of their motion to quash the indictments is totally without merit, and fails to support said motion.

### Defendants' third proposition.

The eighth reason assigned in support of the motion to quash is as follows: "The order filed April 21, 1928, in the Court of Quarter Sessions of the Peace of Lackawanna County, Pennsylvania, to No. 280, May Sessions, 1928, and signed 'By the Court,' purporting to continue the grand jury summoned to meet on April 16, 1928, is illegal and void because it was made by one of the judges of said Court of Quarter Sessions alone, to wit, by the Honorable George W. Maxey, and was not made by the Court of Quarter Session or by the judges of said Court of Quarter Sessions, there being three judges of said Court of Quarter Sessions. Said indictment was not found by the grand jury during the period or term for which said jury was summoned, but was found after the making of the order referred to in this paragraph in reliance upon the supposed validity of said order after the time for which said grand jury was summoned had expired."

We do not think that this assignment requires any extended discussion.

It has been the immemorial custom in this county to arrange the court calendar at the end of each year and to assign for the succeeding year the respective judges to the respective grand juries during the year and to assign to each judge, respectively, the civil and criminal lists for the court weeks of the succeeding year. We assume that this is the custom in all courts where there is more than one judge. In the court calendar made up for this county for the year 1928 the grand jury which was scheduled for April 16, 1928, was assigned to the charge of Judge Maxey.

It is no more illegal to have one of three judges take entire charge of a grand jury during the term he is assigned to it than it is to have one judge alone try a civil or criminal case. When by order of court, as evidenced by the court calendar, he is assigned to take charge of the list during certain weeks, he becomes the agent of the court for those periods, and all his official acts done pursuant to the authority vested in him by his principal, the court, unless expressly overruled by the court acting by a majority of the members thereof, are the acts of the court itself.

In the very recently-reported case of Com. v. Parker, 294 Pa. 144, in an opinion by Moschzisker, C. J., it was held by the Supreme Court that where, after a conviction for murder, the trial judge sits and hears alone a motion for a new trial and refuses the same, the Supreme Court will not send the case back for a new trial where it appears that no request was made in the court below for a hearing of the motion by the court *in banc*, and that this is especially proper where the record suggests no doubt of the justice of the verdict.

In the case now before us, if any exception had been taken to the action of Judge Maxey in continuing the grand jury or charging the grand jury to investigate election frauds, this would have been a proper matter for the court *in banc* to have acted upon, but in the absence of any exception to the proceedings taken at that time, and in view of the fact that Judge Maxey was assigned by the court to take charge of that particular grand jury, and in view of the further fact that one of the other judges of the court did concur in Judge Maxey's order of April 23, 1928, holding over the grand jury subject to the power of the court to call said grand jury into session, and did concur in Judge Maxey's order of May 1, 1928, ordering the grand jury summoned for May Term to assemble in session on May 3, 1928, and in view of the fact that Judge Maxey's order of April 21, 1928, continuing the grand jury in session for the week beginning April 23, 1928, because it had not disposed of all the cases before it for the preceding week, was an act within the scope of the authority vested in him when he was assigned by the court to take charge of the grand jury, and was in accordance with the immemorial practice of this court where a grand jury have found it impossible to finish their work during the first week of the session, and was entirely proper, we find no merit in the eighth reason assigned by the defendants for quashing the indictment.

The Act of April 27, 1927, P. L. 420, provides that "the judges of the Courts of Quarter Sessions and Oyer and Terminer shall also have power to hold the grand jury summoned at any term during the *interim* and until the grand jury of the next succeeding term is assembled, and shall have full power, without the issuing of a new *venire*, to call such grand jury to assemble in session and dispose of any business properly laid before a grand jury at any regular term."

It will be noted that this act uses the words "the judges," but does not use the words "the court."

Two of the three judges of the Court of Quarter Sessions and Oyer and Terminer of Lackawanna County concurred in the order of Judge Maxey dated April 23, 1928, holding the grand jury over in readiness to be called into session to dispose of any further business, and also in the above order of May 1st. Even if Judge Maxey had made these orders without the concurrence of another judge, they would have been valid orders, because, as already stated, he had been assigned by the court to take charge of the grand jury for May Term, 1928, of the Courts of Quarter Sessions and Oyer and Terminer.

### Other reasons.

The other reasons assigned for quashing the indictments, which reasons allege misjoinder and duplicity in the indictments and failure to specify what the alleged fraud named in the indictment consists of, and failure to specify what illegal acts the defendants conspired to do, are entirely without merit. These indictments follow the forms that have been used in the criminal courts of Lackawanna County for a number of years and have successfully withstood every attack made upon them, which attacks have been similar to those now made by the defendants in the case at bar.

These indictments charge, *inter alia*, conspiracy to violate the Uniform Primaries Act, and the offense is set forth in the words of the act of assembly, to wit, a conspiracy "to commit a wilful fraud in the conduct of their (the defendants') respective duties" as members of said election boards. The Act of March 31, 1860, § 11, P. L. 433, provides: "Every indictment shall be deemed and adjudged sufficient and good in law which charges the crime substantially in the language of the act of the assembly prohibiting the crime, and prescribing the punishment, if any such there be, or, if at common law, so plainly that the nature of the offense charged may be easily understood by the jury."

The indictments in these cases conform to the requirements laid down by the criminal law of Pennsylvania, and conform also to the tenets of good pleading. The defendants are left in no doubt as to the precise nature of the charges they have to meet. In fact, the Commonwealth has gone further in particularizing the offense which the defendants are alleged to have committed than the law requires it to do. This, of course, gives the defendants no ground for complaint.

### Final conclusion.

While defendants in every case are entitled to all the rights given them by the laws of the land, the judges of the courts should not be assiduous in their search for technical and flimsy reasons for quashing indictments in election cases. As was well said by Justice Paxson in the case of Com. *v.* McHale et al., 97 Pa. 397, 410, in which case the Supreme Court reversed in 1881 the court of Luzerne County for quashing indictments in election cases: "An offense against the freedom and purity of elections is a crime against the nation. It strikes at the foundation of republican institutions. Its tendency is to prevent the expression of the will of the people in the choice of rulers and to weaken the public confidence in elections. When this confidence is once destroyed, the end of popular government is not distant. . . . It would be a reproach to the law were it powerless to punish . . . offenses against the purity of elections. It . . . was error to quash the indictments."

In our judgment, it would be a gross error, a public wrong, to quash the election indictments in these cases.

### Order.

Now, to wit, March 5, 1929, the rule to show cause why the indictment in the above-entitled case should not be quashed is discharged.

The opinion filed in this case shall also be considered the same as if it had been filed in the cases of Com. *v.* Michael Kenehan et al., No. 388, May Sessions, 1928; Com. *v.* Frank Loftus et al., Nos. 391 and 392, May Sessions, 1928; Com. *v.* Michael Powando et al., Nos. 396 and 397, May Sessions, 1928; Com. *v.* Leo Quinn et al., Nos. 398 and 399, May Sessions, 1928; Com. *v.* Joseph Perry et al., Nos. 381, 385 and 386, May Sessions, 1928; Com. *v.* Peter Powlack et al., Nos. 382, 383 and 384, May Sessions, 1928; Com. *v.* Michael Dyno et al., Nos. 380, 389 and 390, May Sessions, 1928.

Leach, J., concurs. Newcomb, P. J., dissents.

### Supplemental opinion.

Maxey, J., April 8, 1929.—As a supplement to the opinion in the above-entitled case which we filed on March 5, 1929, we file the following copy of a letter received by us from the Master of the Crown Office and Registrar of the Court of Criminal Appeal, England, in response to a letter we addressed

to the Lord Chief Justice of England, inquiring as to the mode of swearing witnesses and as to the procedure before the grand jury in England:

Crown Office—King's Bench Division

London, England, 15th March, 1929.

Sir: The Lord Chief Justice of England has handed me your letter to him of the 13th instant and has requested me to reply thereto.

In England the judge does not sit with the grand jury. The procedure is that the grand jury appear in court before the judge. The foreman of the grand jury then takes an oath as such foreman that he will diligently inquire and true presentment make of all such matters and things as shall be given him in charge, etc. Each of the remainder of the grand jury then takes an oath swearing to observe and perform the oath taken by the foreman.

The judge then charges the grand jury, referring to such of the cases that will come before them as he thinks fit. The grand jury then retire to their own room, examine the witnesses and consider the bills of indictment in private.

The witnesses who appear before the grand jury are not sworn in open court. In the year 1856 an Act of Parliament, 54 and 55 Vict. C. 54, provided, by section 2, that it should not be necessary for any person to take an oath in open court in order to qualify such person to give evidence before the grand jury. Section 1 of the same act provides that the foreman of the grand jury is thereby authorized and required to administer the oath to a witness appearing before the grand jury.

The grand jury in England are not bound by any rules of evidence: Per Mr. Justice Byles in Reg. v. Bullard (1872), 12 Cox Criminal Cases, 353. In Reg. v. Russell (1842), 1 Carrington and Marshman's Report, 247, Baron Gurney and Mr. Justice Wightman held that when the grand jury have found a true bill, the judges before whom the indictment comes ought not to inquire whether the witnesses were properly sworn, and it seemed to them that an improper mode of swearing the witness would not vitiate the indictment, as the grand jury were at liberty to find a bill upon their own knowledge merely.

It is not possible for me to give all the reasons for which indictments can be quashed in England. If an indictment is bad on the face of it, it can be quashed. It must, however, be borne in mind that the court has now, especially since the passing of the Indictments Act of 1915, 5 and 6 Geo. 5, C. 90, very large powers of amendment which are frequently exercised, provided such amendment can be made without injustice to the prisoner. I am, Sir,

Yours faithfully,

LEONARD W. KERSHAW,

Master of the Crown Office and

Registrar of the Court of Criminal Appeal.

Judge George W. Maxey, Commonwealth of Pennsylvania,

45th Judicial District, Judges' Chambers,

Scranton, Pa., U. S. A.

NEWCOMB, P. J., dissenting, March 6, 1929.—This is one of a group of indictments numbered from 380 to 399, May Sessions, 1928, inclusive. They are founded on presentments originating in special instructions by the court directing the grand jury to investigate the conduct of the 1928 primary election in certain districts. The disposition of one will apply to all. *Inter alia*, they are attacked for irregularity because the witnesses had not been sworn by an official competent to administer an oath.

Regardless of other reasons assigned for the present motion, this is believed to be fatal, and, therefore, I cannot concur in the judgment of the court affirming the validity of the indictments.

True, these are endorsed with the names of witnesses, but the fact is without bearing on the issue raised by this specific objection. For it is not claimed that any witness was sworn or heard after the bills had been prepared. While defendants have been at pains to make proof of that fact, it turns out to be free from dispute. The motions were argued by counsel in October, when it was freely conceded by the Commonwealth that no evidence had been taken save at the antecedent investigation, the witnesses being then sworn only by the foreman in the grand jury room. In other words, upon submitting the

presentments and being directed to return formal indictments, the grand jury did so without further inquiry as soon as the bills could be drawn.

By his brief, filed Jan. 9th, counsel for the Commonwealth contends that this procedure is unobjectionable. "The swearing of witnesses by the foreman," he says, "was in accord with the practice followed in this county since its creation and also with the practice as adopted and approved by the Superior Court of Pennsylvania." Citing Com. v. Dietrich, 7 Pa. Superior Ct. 515, and Com. v. Klein, 40 Pa. Superior Ct. 352.

Mere local practice in this county, if any, would hardly be effective to vary the established course of common law procedure. What is more, the assumption of fact is somewhat overstated. In 1912 this court had occasion to consider the question and it was ruled adversely to the assumption. An indictment was quashed because a witness, whose name had not been marked on the bill, had been sworn by the foreman. On consideration of authorities there cited, it was held that, except as otherwise provided by statute, witnesses to be sent before the grand jury must first be sworn by the judge or some official in his presence: Com. v. Tomli, 21 Dist. R. 1016, 13 Lacka. Jurist, 31.

In this State, it was first "otherwise provided" by Act of April 5, 1826, § 1, 9 Sm. Laws, 136. This conferred upon the foreman, or any other member of the grand jury, power to administer the oath to those witnesses whose names had been marked on the bill of indictment by the attorney-general. That has in the meantime been amended by substituting the district attorney for the attorney-general: Act of March 31, 1860, § 10, P. L. 427 (at page 433).

No doubt, in this instance, had the witnesses been lawfully qualified, further inquiry could have been dispensed with when the bills had been made ready. At least, one can think of no satisfactory reason in such case why the grand jury should resort to the formality of duplicating the evidence already in hand. That is not the point. The trouble is that, if the statute means only what it says in plain English, the members of the grand jury could not administer a lawful oath. Such authority as they have in that regard attaches by reason of an official act of the district attorney which had not as yet been exercised, nor could then be exercised, as it is incidental only to the submission of a formal bill, and that stage had not then been reached.

As in case of any other power of statutory origin regulating penal proceedings, it is not apparent how its operation can be legitimately varied and enlarged by mere latitude of construction. Yet that it is open to such construction is claimed by the Commonwealth to have been announced by the appellate court. The cases relied upon for that contention are believed to have been wholly misconceived by the learned counsel.

The point was not involved in either the Dietrich or the Klein case. Each was disposed of by opinion of the late President Judge Rice, to whom the question was no stranger. The context shows that the reference was to the authority conferred by the Act of 1860, though without intending to suggest that the courts are at liberty to disregard its express limitation. This the learned judge had theretofore had occasion to consider when presiding in the courts of Luzerne County. It was then and there held that the grand jury exceeded its authority when they undertook to administer the oath to a witness whose name had not been marked on the bill, and, therefore, an indictment was quashed: Com. v. Wilson, 6 Kulp, 40, per Rice, P. J.

It has been uniformly so held wherever the question has arisen. See Com. v. Schall et al., 5 York Leg. Record, 139 (1892); Com. v. Frescoln, 11 Lanc. Law Rev. 161 (1894); Com. v. Cochran, 22 Lanc. Law Rev. 188 (1904); Com. v. Price, 4 Kulp, 289 (1887).

While it does not appear to have been put at issue in the appellate courts, yet Com. *v.* Jillard, 26 Pa. 169, has been repeatedly referred to in the lower courts as supporting their view.

As above noted, the learned counsel for the Commonwealth contends that a "practice" to the contrary "has been adopted and approved by the Superior Court of Pennsylvania."

The supposition is rather pointedly at variance with what the court said in a recent case.

The subject of discussion was the right to relief by motion to quash an indictment for matters not apparent on the face of the record. It was referred to as well settled in this State. In that connection, the court, by opinion of Judge Gawthrop, was at pains to mention instances where the motion would lie—*inter alia*, "where the only witnesses who appeared before them were persons whose names were not endorsed upon the bill, and, therefore, could not be sworn by the grand jury (Act of March 31, 1860, P. L. 427):" Com. *v.* Morris et al., 91 Pa. Superior Ct. 571.

The unbroken current of authority is to the effect that at common law the members of the grand jury were incompetent to qualify the witnesses sent before them; hence, he who asserts that they now have such authority in this jurisdiction must be able to point to the statute which says so. The Act of 1860, *supra*, has the field to itself. But, for present purposes, it falls short of the mark. The attempt to apply it here is hopeless. Being, in so many words, limited to the case of witnesses officially designated by endorsement on a bill of indictment, it is vain to suppose that it serves equally well in a proceeding where there is no bill to submit. It is for the legislature, and not for the courts, to amend the statute by abolishing its restriction.

I would, therefore, allow the motions and quash these indictments.

From William A. Wilcox, Scranton, Pa.