# Adams *versus* Pittsburgh Insurance Company.

1. There is a great necessity to give effect to a custom of captains of steamboats at a large river port to insure their boats and give premium notes therefor, the perils of navigation being so well known that a due regard for some indemnity against loss is justly recognised as a necessary precaution.

2. If such a custom is clearly and distinctly proved to have existed so long as to be generally known, the owners of a steamboat so insured are liable upon the notes thus given for the insurance.

3. That a custom so general and notorious may exist as to authorize the captain of a steamboat to effect an insurance on it for the benefit of the owners, without their express direction, is well settled by authority. It would not be in conflict with any statute, nor would it be unreasonable or contrary to public policy.

4. To establish the validity of a custom the usage must have existed so long as to become generally known, and it must be clearly and distinctly proved. The law prescribes no particular number of witnesses to establish the fact, although the concurring testimony of a large number may increase the probability of its being generally known.

[Adams v. Pittsburgh Ins. Co.]

October 7th 1880. Before SHARSWOOD, C. J., MERCUR, GORDON, PAXSON, TRUNKEY, STERRETT and GREEN, JJ.

Error to the Court of Common Pleas, No. 1, of *Allegheny county :* Of October and November Term 1880, No. 65.

Assumpsit brought by the Pittsburgh Insurance Company against John S. Adams and Adam Jacobs, who survived James Collins, late owners of the steamboat "Glasgow." John S. Adams was the only one served. The claim of the insurance company was to recover on a promissory note premiums for insurance, which, in 1867, had been taken by said insurance company on the steamboat "Glasgow," at request of G. W. Johnston, the captain, who gave a note of the owners for the premiums. The testimony showed that in 1867 the said James Collins, Adam Jacobs and John S. Adams were the part owners of the steamer "Glasgow" —each having the one-third part thereof. The steamer was not held by them as partners. In June 1867, at the request of Johnston, but without the knowledge or consent of either Adams or Jacobs, the insurance company issued a policy on the steamer for the sum of $5000, the loss being payable to whoever may be the owners. For the premium, which was ten per cent., a note was given.

The steamboat, when this note was given and insurance taken, was at the port of Pittsburgh, her home port, and John S. Adams was a resident of the city of Pittsburgh, and was known to the president of the Pittsburgh Insurance Company, who issued the policy. Adams was not consulted nor in any way informed of the insurance or the note, and the first he knew of the fact that insurance had been taken and note given was when this action was brought—nearly six years after the note was given—*i. e.* on March 8th 1873.

At the trial, before Collier, A. L. J., the plaintiff proposed to prove by the witness, and by other expert steamboat men and business men, that in 1867, and for a long time previous, beyond the memory of man, there existed a custom at the port of Pittsburgh by which insurance upon steamboats was effected by the captain or master of the vessel for the benefit of the owners, and that usually notes were given by the master for the boat owners in the form of the note in suit for the premium of the insurance on vessels thus obtained; that this custom was notorious and universal—generally known in steamboating in Pittsburgh—for the purpose of showing that the master, Johnston, had authority, as agent of the owners in this case, to make this note for insurance effected upon the steamboat "Glasgow" under this custom, for the benefit of the owners.

Objected to, first, as irrelevant and incompetent; and second, that it is now, and was in 1867, and for a long time prior thereto, had been a well-settled rule of commercial law that the part

owners of a vessel were not partners, and that no one part owner or captain had the power to give a note to bind his part owner, and that it is incompetent by custom to attempt to interfere with a well-settled rule of commercial law; and third, that such a custom as is offered to be proven is illegal. Objections overruled.

The following were among the points of the defendant all of which the court refused :—

2. The evidence as to custom is not sufficient to justify the jury in finding that in 1867 the captain of the steamer " Glasgow " was authorized to insure the steamer for the part owner, J. S. Adams, without his knowledge or consent.

6. If the jury believe that J. S. Adams, the defendant, did not authorize Captain Johnston and Collins, or either of them, to insure the steamer " Glasgow " for him (Adams), the plaintiff cannot recover.

5. The custom attempted to be proven in so far as it relates to and pretends to authorize the master of a vessel in her home port, and where the part owner lived, to insure for the part owner, is unreasonable and invalid.

8. In order to enable the plaintiff to recover in this action, it must show a joint liability on the part of J. S. Adams, Adam Jacobs and James Collins to pay the premiums on the insurance policy; and there being no evidence in the case to show such joint liability, the plaintiff cannot recover.

10. If the court decline to charge as requested, " that under all the evidence in the case the plaintiff cannot recover," then they are requested to charge " that the plaintiff cannot recover from the defendant, J. S. Adams, more than his proportion of the premium · for insurance—that is, according to his interest in the vessel—the one-third part thereof."

In the general charge, the court, inter alia, said :—

" If you believe the evidence establishes a general custom, then it would make no difference whether Mr. Adams actually knew in this particular case of the captain insuring the boat, and your verdict should be for the plaintiff. If you do not believe the testimony established a general custom, you will find for the defendant. * * * If this custom was so long established, so well known upon the river, so universally or generally acted upon (it would not make any difference if there were a few exceptions or variations) that the steamboat men probably knew it, the owners probably knew it, and the insurance companies knew it and were acting upon it; if it was that kind of a custom, the parties would be presumed to know it; but it must come up to that standard."

Verdict for plaintiff for $1026.20, and after judgment thereon defendant took this writ and alleged that the court erred in admitting the above testimony, in the refusal of defendants points and in the foregoing parts of the charge.

[Adams *v.* Pittsburgh Ins. Co.]

*W. G. Guiler* and *D. T. Watson*, for plaintiff in error.—The court below held that where there were three part owners of a vessel in her home port—at which port one of the part owners resides—that a custom would be good to individually bind this part owner for the entire premiums on insurance taken out without his knowledge or consent by the captain of the vessel. When this case was here before, though the peculiar features of the vessel being in her home port, and one part owner being liable for all the the other part owners' premiums were not alluded to, this court said such a custom was "derogatory of the rights of such owners, and not required for the advancement of commerce and trade." It is submitted that such a custom is unreasonable. Why should a captain of a vessel, in her home port, where the part owner lives, have the power to take out any amount of insurance he sees fit, and bind the part owner for the entire premiums for the whole ship without his knowledge or consent? Bottomry and respondentia bonds are only allowed in foreign ports and in great emergencies, but even then do not bind the personal estate of the owners. They bind only the ship. But the custom here pretended is not alone to bind the ship, but to bind each part owner's individual estate for the entire premiums; and this too by the issuing for the owners of the ship, and as binding upon them negotiable promissory notes by the captain.

The evil results of such a custom of the power of a captain to bind the part owner by a negotiable paper are far reaching. No part owner's estate would be safe. It is entirely, we believe, unprecedented in the whole categories of custom. This court has said it is unnecessary. It is submitted it is illegal as being in flat contradiction of the rule of law that a captain cannot insure, or issue a promissory note to bind the part owner; and coming in conflict with this rule it must fall. In the notes of Mr. Justice SHARSWOOD, in 1 Blackstone, *79, note 21, he says: "A usage or custom is never admitted against the express agreement of the parties, nor in violation of any statute or well-established rule of law:" Cox *v.* Heisley, 7 Harris 246.

It is the well established rule of law that a captain or master can neither insure the vessel nor issue a negotiable promissory note which will bind the owners: Story on Agency, sect. 35; Flanders on the Law of Shipping, p. 164, sect. 141; Knight *v.* Eureka F. & M. Ins. Co., 26 Ohio St. 669; General Interest Ins. Co. *v.* Ruggles, 12 Wheat. 412; Patterson *v.* Chalmers, 7 B. Mon. 598, 599. Blackstone says (vol. 1, *77), one essential of a custom is that it "must be reasonable," and such that "no good legal reason can be assigned against it." If the custom is unnecessary, as this court has said, and not required for the advancement of trade, how is it reasonable to vest a captain with the power to sign the ship-owner's name to promissory notes, or to insure for the part owner

[*Adams v. Pittsburgh Ins. Co.*]

in the home port of the vessel where the owner lives ?   In Still-
man *v.* Huroe, 10 Texas Rep. 109, it was ruled that a custom for
captains of coasting vessels to sell the lumber. with which they
were laden, in the harbor of Brazos, St. Iago, without authority
from the owners, was unreasonable and illegal.   But admitting that
such a custom might be good if properly proven, there was
absolutely no proof of a custom which should have enabled the
plaintiff below to go to the jury in this case.   This insurance was
taken out by Captain Johnston without the authority, knowledge or
consent of Mr. Adams.   Therefore to bind Adams for the same,
the custom must show the power of the captain to take out the
insurance without the authority, knowledge or consent of the
owner.   So far from the evidence in this case showing any such cus-
tom, it was directly to the contrary,.   The witnesses to this pre-
tended custom agreed that the captain of his own motion could
not determine the amount of insurance to be taken out, but that
was always settled by consultation with the part owners.   Mr.
Gordon, president of the company, Mr. Huttz, Captain Atkinson
and Captain Dean all agree in this, and no one disputes it.   In
the case at bar, as Mr. Adams never knew or heard of the insur-
ance, Johnston did not consult with him.   As the custom as
proven was that in fixing the amount of the insurance the
captain was bound to consult the part owner, and as in this case
Captain Johnston did not consult Mr. Adams, but insured
without it, the case as proven did not fall within the custom.
The alleged custom was not definite and certain and uniform.
This court, when the case was here before, said: "A custom
not only can but must be so proved as to leave no doubt upon
the mind with reference to its nature and character.   Doubt must
be wholly eliminated from the evidence adduced, or the usage is
not well proved."   A custom to pay twopence an acre in lieu of
tithes is good ; but to pay sometimes twopence and sometimes
threepence is bad as uncertain : 1 Black. Com. *78.   We think
it clear that the evidence instead of proving a usage which au-
thorized the insurance in this case, proved directly the contrary,
But, in addition to this, the pretended usage was neither definite
nor certain.   Sometimes the clerk gave the note, and sometimes
the captain.   Sometimes the name of payee in the note was filled
up; sometimes not.   Dr. Ray testified, "I won't say it was the
universal custom."   Captain Atkinson said when he run as captain
the owners on shore took out the insurance.   Captain Dean said
he never insured without consultation with part owners.   Captain
Rhodes said when the boat first came out the owners insured her,
and if the owners were present at the home port of the vessel it was
customary for them to insure her.   The president of the insurance
company admits that this was the first insurance taken out.   Cap-
tain Stockdale says his owners knew before he insured, and he

[Adams v. Pittsburgh Ins. Co.]

knows of no custom authorizing to the contrary. It is submitted this falls far short of a usage which is so definite, uniform and certain as to leave no doubt upon the mind; and the whole evidence shows that though sometimes the captain took out the insurance, and perhaps generally, he always did it with the authority and knowledge of, and after consultation with, the owners; and there was no custom to the contrary.

It is believed that the charge of the court does not correctly state the rule of law as to the evidence necessary to establish a custom. Though firm in our second position, that there has been no custom proven to justify a recovery in this case, it is our duty to call the attention of the court to our last position, that if this court should differ from us so far, that our next position would be that such a usage, if proven, would not be good to the full extent claimed, but only in so far as each part owner's share was concerned. One part owner cannot bind any other part owner without his consent in taking out insurance on the whole ship : Abbott on Shipping 107 ; Turner v. Burrows, 8 Wend. 144. Why it should be allowed to a captain so to do we are unable to see. We submit this judgment should be reversed without a venire.

*A. M. Brown*, for defendant in error.—It was held in McMasters v. Pennsylvania Railroad Co., 19 P. F. Smith 374, that a custom, so long persisted in as to be known and practised by a community, is the law of the particular business in which it exists; and the presumption arises, that it is, in the view of parties who contract about its subject-matter. In this state a custom is sufficiently ancient if it has existed long enough to be generally known : Collins v. Hope, 3 Wash. C. C. 149 ; Snowden v. Warden, 3 Rawle 101 ; McMasters v. Pennsylvania Railroad Co., *supra*. A custom or usage will control the general common-law liability of carriers, although limited to a particular line of stages, or to a single port or place : Cope v. Cordova, 1 Rawle 203 ; Koons v. Miller, 3 W. & S. 271–72 ; Gordon & Walker v. Little, 8 S. & R. 533 ; Pittsburgh v. O'Neill, 1 Barr 344. A custom on the Ohio river was permitted to vary the responsibility of a carrier in Gordon & Walker v. Little, *supra;* and a usage in the city of Philadelphia was allowed to add a warranty to a contract of sale, which in fact and in law did not embrace such warranty : Snowden v. Warden, 3 Rawle 101. Usage or custom may control or curtail the execution of a contract : 1 Hill. on Cont. 295 ; Eyre v. Insurance Co., 5 W. & S. 116 ; Helene v. Philadelphia Life Insurance Co., 11 P. F. Smith 107, and cases therein cited. So a contract with a bank may be construed by the usage of such bank : Mills v. Bank, 11 Wheat. 431 ; Chickopee v. Eager, 9 Metc. 583. And in DeForest v. Fulton Insurance Company, 1 Hall 84, evidence was received of the usage of commission merchants to charge insurance

[Adams *v.* Pittsburgh Ins. Co.]

without orders. Usage is admissible to construe a bill of lading as. to weight: Russian *v.* Silva, 13 C. B. N. S. 610. So upon the question whether the plaintiff, a broker, is entitled to certain commissions not specified in the charter-party, proof that on several occasions the defendant had paid nine similar commissions, is admissible as evidence, either that the defendants knew and assented to the plaintiff's custom to make such charge, or knew that the charges were in conformity to the usage of the trade: Weber *v.* Kingsland, 3 Bosworth (N. Y.) 415. In an action for damages for a difference between tobacco bought by sample and the samples, evidence of a local custom to buy and sell in bulk, by samples prepared by the state inspectors, without insuring correspondence in quality, is admissible: Gunther *v.* Atwell, 19 Md. 157; 1 Hill. on Cont. 189, sect. 27. Ignorance, in fact, of an established usage on the subject will not affect its operation: 1 Hill. on Cont. 190, sect. 28; Id. 294–95. It is no sufficient answer to the evidence of usage to say that under the ancient maritime law the captain of a vessel had no implied authority to effect insurance on the vessel for the owners by virtue merely of his general agency. Every day old rules are being gradually modified by contract, usage or notice, to fit them to the new order of business. "It would be strange," said the late Chief Justice THOMPSON, in McMasters *v.* Pennsylvania Railroad Co., "if the process of improvement by custom and usage is to stop just here, and go no further." Indeed there is no good reason why the master of a steamboat should not have the same implied authority, by usage, to insure the vessel for the owners that he possesses by custom for the doing of other acts relating to the care, preservation and control of the vessel. The Act of Assembly of April 20th 1858, sect. 1, (III.) Pamph. L. 363, relating to liens and attachments against "steamboats or vessels navigating the rivers Allegheny, Monongahela or Ohio," expressly recognises the validity of all bills, notes, &c., signed and given by any owner, owners, agent or master, for building, repairing, furnishing and insuring such boats or vessels, and gives a lien therefor to the payee or his assignee or endorsee; thus showing that the legislature in providing a statutory remedy for securing and enforcing claims against vessels recognised the custom and the implied authority of the master to insure a vessel for the benefit of the owners and render them liable upon the contract. All customs, like all laws, are to a certain extent derogatory of the rights of individuals, but that is not a good reason why they should not exist or be enforced. We submit that the alleged custom is not unreasonable. There is no good reason why the master in the command and control of the vessel should not have the right to make a contract of insurance as he has the right to make other contracts in the line of his duty; and in the vicissitudes of trade on the western rivers it often

[Adams *v.* Pittsburgh Ins. Co.]

becomes urgently necessary to change the voyages and risks of the vessel, as the testimony in this case shows. It may be that a custom in "flat contradiction" of a statute would not be held good, but the citation of an old common-law rule is not sufficient to overturn a more recent custom which has become well established through the growth and advancement of modern times. The old rules of the common law are derived from the usages or customs of the olden time, but in many instances greatly changed by statutes or later customs. The custom asserted in this case conflicts with no statute, is reasonable, and tends to promote the advancement of trade and commerce.

Mr. Justice MERCUR delivered the opinion of the Court, November 1st 1880.

"*Consuetudo*," said Sir Edward Coke, "is one of the main triangles of the laws of England; those laws being divided into common law, statute law and particlar customs, for if it be the general custom of the realm, it is part of the common law :" Co. Lit. 113–15. "A custom used upon a certain reasonable cause, depriveth the common law :" Littleton, page 112, sect. 169. In Vanhearth *v.* Turner, Winch. Rep. 24, Chief Justice Hobart said, "the custom of merchants is part of the common law of this kingdom, of which the judges ought to take notice, and if any doubt arise to them about the custom they may send for the merchants to know their custom." That a custom so general and notorious may exist as to authorize the captain of a steamboat to effect an insurance on it for the benefit of the owners without their express directions, we think well settled by authority. It would not be in conflict with any statute, nor would it be unreasonable or contrary to public policy. In Vanness *v.* Pacard, 2 Pet. U. S. Rep. 148, it was held that evidence was properly received to prove that a custom and usage existed in the city of Washington which authorized a tenant to remove any building erected by him. In Gordon et al. *v.* Little, 8 S. & R. 533, it is held, a usage or custom varying the liability of common carriers by water from that of the common law may be proved, even to give construction to the words "inevitable dangers of the river." The usage of trade in respect to particular voyages, or risks to which a policy of insurance relates, has always been invoked to give construction to its meaning: Park on Insurance 30. Usage may add a new construction variant from the face of the instrument, as much as if it had been contained in a new clause or by a reference to it: Eyre *v.* Marine Ins. Co., 5 W. & S. 116.

It is well settled, as a general rule, that the intention of the parties to a contract shall prevail unless it be to do something either *malum in se*, or *malum prohibitum* : Snowden et al. *v.* Warder; 3 Rawle 101.

[Adams *v.* Pittsburgh Ins. Co.]

A custom so long persisted in as to be known and practised by a community is the law of the particular business in which it exists. Such a custom is presumed to be in the view of the parties when they contracted about its subject-matter : McMaster *v.* Pennsylvania Railroad Co., 19 P. F. Smith 374 ; Carter *v.* Philadelphia Coal Co., 27 Id. 286. To make a usage obligatory on the parties, it should be so well settled that persons engaged in the trade must be considered as contracting in reference to it. No particular period of time is requisite to the establishment of a usage so as to affect contracts : 1 Phil. on Insurance 83. The true test is that it has existed a sufficient length of time, not only to have become generally known to the dealers who are to be affected by it, but also to warrant the presumption that contracts are made in reference to such usage or custom : Smith *v.* Wright, 1 Caines Rep. 43 ; Snowden *v.* Warder, *supra*. This rule is especially applicable to commercial transactions, and either party to such a contract may prove the usage : Id. In all matters of trade usage is of vital importance, and in policies of insurance in particular, a great latitude of construction as to usage has been admitted : Phil. on Ins. 80. There is a great necessity for giving effect to a custom in regard to the insurance of a steamboat in the custody of one not the owner. The perils of navigation are so well known, that a due regard for some indemnity against loss is justly recognised as a necessary precaution. Hence it was held in Oliver *v.* Green, 3 Mass. 134, that a part owner of a vessel who had chartered the other part with a covenant to pay the value, in case of a loss, might insure the whole vessel as his property, without disclosing that he had a special property only, in a moiety thereof. So in DeForest *v.* Fulton Fire Ins. Co., 1 Hall 94, it was held that, a commission merchant might recover on a policy of insurance for goods in his possession, destroyed by fire, beyond the value of his property therein, without any express orders from the consignors of the goods to effect such insurance, on proof that such was the usage of commission merchants in the city of New York.

The remaining question is, was the evidence sufficient to submit to the jury to find the existence of the custom alleged ? To establish its validity the usage must have existed so long as to have become generally known, and it must be clearly and distinctly proved. The law prescribes no certain number of witnesses to establish the fact, although the concurring testimony of a large number may increase the probability of its being generally known. Where evidence of usage is admitted, the witnesses must be confined to the *fact* of usage, and not be allowed to give their opinions : Gordon *v.* Little, *supra*, and cases there cited.

Nine witnesses, residents of Pittsburgh, testified to the existence of the custom. Some had been captains of steamboats, some owners and part owners thereof, others officers of insurance companies.

[Adams v. Pittsburgh Ins. Co.]

All were qualified, by their knowledge of the business, to know the fact that such usage actually existed. The knowledge of some of them extended over a period of nearly thirty years, that of others for various shorter periods, all coming down to the time of the trial. Without stating their evidence in detail, it may be said they testified it was the custom for the captains of steamboats to procure the insurance thereof, and execute a premium note therefor in behalf of the boat and owners. While to the knowledge of some of the witnesses there were occasional departures from this method, yet the general usage was as stated. When the captain applied for an insurance on the boat of which he was master, no question was ever asked him as to his authority to act for the owners. Such authority was always presumed. It is true some witnesses testified on cross-examination they did not know that the captain acted without the consent of the owners. This absence of knowledge, in that respect, in no wise impaired the force of their testimony as to the usage of the captain in effecting the insurance without alleging any express consent of theirs. The underwriters did not ask for express directions to insure from the owners. The captain did not represent that he had any such. This was the custom which the witnesses testified existed as a fact. It is claimed that, conceding the captain might make a contract of insurance to bind the owners, yet he could not give a note, negotiable in form, in their names. The evidence was, and the jury has found, the invariable custom was to secure the payment of the premium by note in such form. It is a well recognised rule that authority to effect a policy of insurance, is authority to sign a note for the premium as agent of the assured when it is customary to give such notes, and the principal is conusant of the custom: 1 Phil. on Ins., sect. 518; Stackpole v. Arnold, 11 Mass. 27. Besides, in the present case the declaration was not on the note alone; but it also contained a count on the contract of insurance. It further appears by the evidence of the plaintiff in error, that he gave very little attention to the management of the boat; but intrusted it to the captain, and to Collins, who was a part owner thereof. It is shown that Collins had knowledge of the insurance, and made a payment of a small sum on the note.

The only witness called on the part of the plaintiff in error was the party himself. He does not testify that, as matter of fact, no such custom existed in Pittsburgh; but he knew of no custom which would authorize Captain Johnson, or any captain of his vessels, to insure the vessel or his interest in it, without his knowledge or authority. He thus testifies to his understanding of the law, and leaves unanswered the fact of an existing usage on which the claim rests and supports the action.

When this case was here before (26 P. F. Smith 411), we thought the evidence insufficient to submit to the jury. On the

[Adams *v.* Pittsburgh Ins. Co.]

last trial the increased number of witnesses, and their clear, distinct and uncontradicted evidence as to the existing and well known custom and usage, was sufficient to carry the case to the jury. We discover no error in the record.

Judgment affirmed.

Justices GORDON and STERRETT dissented.