## WOLFE v. TEXAS CO.

### No. 1341.

Circuit Court of Appeals, Tenth Circuit.
April 8, 1936.

426

R. M. Rainey and Streeter B. Flynn, both of Oklahoma City, Okl. (Rainey, Flynn, Green & Anderson, of Oklahoma City, Okl., on the brief), for appellant.

Charles B. Cochran, of Oklahoma City, Okl. (John R. Ramsey, J. H. Hill, and Sol H. Kauffman, all of Tulsa, Okl., and Ames, Cochran, Ames & Monnet, of Oklahoma City, Okl., on the brief), for appellee.

Before LEWIS, PHILLIPS, and McDERMOTT, Circuit Judges.

PHILLIPS, Circuit Judge.

On May 23, 1922, Wolfe as lessor, entered into an oil and gas lease with Charles M. Smith, as lessee, of 40 acres of land in Seminole County, Oklahoma, for a term of five years and so long thereafter as oil or gas should be produced therefrom. On May 23, 1922, Smith assigned the lease to Amerada Petroleum Corporation, hereinafter called the Amerada.

On March 5, 1926, Bass Furniture and Carpet Company, hereinafter called the Furniture Company, commenced a suit against Wolfe and others in the District Court of Seminole County, Oklahoma, claiming title to the land. That court adjudged the Furniture Company to be the owner of an undivided 1/3rd of 11/12ths and Wolfe to be the owner of an undivided 2/3rds of 11/12ths of the land. On appeal, the State Supreme Court modified the decree and adjudged Wolfe to be the owner of an undivided 7/12ths and the Furniture Company an undivided 4/12ths of the land. Wolfe v. Bass Furniture & Carpet Co., 152 Okl. 125, 3 P.(2d) 895. The decree became final October 26, 1931.

On March 23, 1927, Mariah Fixico commenced a suit against Wolfe, the Furniture Company, and Amerada, in the District Court of Seminole County claiming an undivided 1/9th of the land. A judgment was entered therein in favor of Wolfe which became final on December 24, 1931.

The provisions of the lease here material read as follows:

"In consideration of the premises the said lessee covenants and agrees:

"1st. To deliver to the credit of lessor, free of costs, in the pipe line to which he may connect his wells, the equal one-eighth part of all oil produced and saved from the leased premises. * * *

"If said lessor owns a less interest in the above described land than the entire and undivided fee simple estate therein, then the royalties and rentals herein provided shall be paid the lessor only in the proportion which his interest bears to the whole and undivided fee."

In January, 1927, Amerada delivered to the Texas Company an abstract to the lease which disclosed the litigation between the Furniture Company and Wolfe.

From December 1926, to February 1930, both inclusive, there was produced from the lease and run by pipe line to the Texas Company, 790,255.07 barrels of oil, which the Amerada sold to the Texas Company. The value of 7/12th of 1/8th thereof was $79,424.23. The Texas Company carried the purchase price of the royalty oil in a suspense account on its books, pending the litigation concerning the title.

In March, 1927, the Amerada gave the Texas Company an indemnifying agreement to protect it from loss on account of adverse claims of title to the lease and a division order covering the seven-eighths working interest. Thereafter the Texas Company paid the Amerada monthly for the working interest portion of the oil run to the Texas Company.

Prior to the time the first oil was run from the lease to the Texas Company, the Amerada requested the Texas Company to provide pipe line facilities connected with the producing wells on the lease and to run the oil produced therefrom and pursuant thereto the Texas Company provided such facilities.

On January 25, 1927, Wolfe wrote Amerada for a production statement and asked why the customary division order had not been submitted. On January 29, 1927, Amerada answered, enclosed a copy of the title opinion, gave the names of the several companies that were running the oil, including the Texas Company and advised Wolfe to take the matter up with them. On February 18, 1927, Amerada wrote Wolfe the purchasers were withholding payment because of the litigation concerning the title and that it was endeavoring to get the title in shape so the purchasers would accept it and pay for the oil and enclosed a statement showing the amount of oil which had been run from the lease. On February 19, 1927, Wolfe answered advising that he would cooperate with the Amerada in clearing the title. On May 17, 1927, Amerada sent Wolfe a statement showing the gross production in barrels and in dollars and the value of the one-eighth royalty in dollars, for December, 1926, and January, February, March and April, 1927. On June 8, 1927, Wolfe requested Amerada to send him a like statement covering the oil runs for May, 1927. That statement was furnished by the Amerada on June 23, 1927. On July 11, 1927, Wolfe wrote the Amerada requesting it to send him a statement of oil run per day and per well and the gross value of the oil and the names of the companies which ran the oil for the month of June, and like statements monthly thereafter. Such statements were furnished by the Amerada to Wolfe during the entire period the title to the lease was in litigation.

Wolfe made no provision to store the royalty oil or market it as produced but depended on the Amerada to market such oil.

On October 17, 1931, Wolfe wrote a letter to the Texas Company in which he inquired as to the agreement between it and Amerada for the purchase of the royalty oil, stated the Amerada had advised him "one-half of the interest owned" by him "is now clear of litigation"; and requested, if payment for royalty oil was to be made through the Amerada and to be distributed to the royalty owners by it, that the Texas Company make payment to the Amerada, so the latter could transmit the amount due to him.

In reply thereto, the Texas Company wrote a letter to Wolfe, dated October 20, 1931, in which it stated it had been holding 11/12ths of the payments for royalty oil in suspense on account of the litigation, requested information as to the termination of such litigation, and advised that upon receipt of the information it would prepare a division order to be signed by him and the other owners of the royalty interests as adjudged by the decrees of the State District Court.

On October 22, 1931, Wolfe wrote a letter to the Texas Company in which he

stated the latter could get the requested information from the Amerada from which it had purchased the oil, that the judgment in the Furniture Company Case was affirmed December 23, 1930, that a petition for rehearing was denied October 23, 1931, that the claim of Mariah Fixico to a 1/12th interest had been adjudged in his favor, but the time for appeal had not expired, and that the Van Buskirk estate claimed a 1/12th interest.

On October 26, 1931, Wolfe wrote a letter to the Texas Company enclosing a copy of the mandate in the Furniture Company Case and requested payment for that portion of the royalty oil freed from adverse claims.

In a letter to Wolfe dated October 27, 1931, Mr. Kauffman, attorney for the Texas Company, stated the Amerada had advised him the abstracts were in the hands of another oil company and that it would deliver them to the Texas Company when they were returned, and that he was enclosing a division order crediting Wolfe with 7/12ths of the royalty interest; he called attention to the fact that judgment entered by the State District Court on the mandate adjudged Wolfe to be the owner of 2/3rds of 11/12ths whereas the State Supreme Court had adjudged him to be the owner of a 7/12ths interest and suggested it was probably an error on the part of the person who prepared the judgment; he requested Wolfe to sign and return the division order and stated as soon as the abstracts were furnished he would examine them and if there were no adverse claims other than the Fixico he would deduct a sufficient amount to protect the Texas Company on that claim and would pay the balance to Wolfe. Wolfe did not reply to the last mentioned letter, but on November 14, 1931, he saw Mr. Kauffman in person and discussed the litigation. Kauffman again told him the Texas Company would not pay in full for the royalty oil until the Fixico case was out of the way; that when the Furniture Company Case was disposed of, the Texas Company, upon the execution of a division order, would pay for Wolfe's share less a sufficient amount to protect it on the Fixico claim. Wolfe neither accepted nor rejected Kauffman's proposition. On November 18, 1931, Wolfe and his attorney came to see Kauffman and satisfied him the Texas Company could safely pay Wolfe on the basis of a 7/12ths interest in the royalty oil, less the amount involved in the Fixico suit. Without giving any reason, Wolfe said that he would not sign a division order. Kauffman then dictated a form of document to be signed by Wolfe, which Wolfe declined to sign because he claimed interest. That was the first time Wolfe made a claim for interest. Kauffman told him it had never been the custom to pay interest on royalty payments withheld because of adverse title claims. Wolfe's attorney then agreed to submit authorities on the question of interest. On November 25, 1931, Kauffman prepared a division order to be signed by Wolfe which included a provision that Wolfe did not waive his claim to interest, and forwarded the same for execution. Wolfe did not execute such division order; but on November 28, 1931, he executed and forwarded to the Texas Company a division order which recited the Texas Company offered to pay, at that time, for 17/36ths of 1/8th of the oil purchased by it, and that Wolfe warranted the title and agreed to hold the Texas Company harmless against the claim of any other person to the oil for which the Texas Company should pay him. The instrument contained the further statement:

"It is understood that the undersigned does not waive any right or claim he may now or hereafter have against the Texas Company for interest on any oil or moneys due him for oil received or run from the above described property."

Upon receipt of that document, on December 1, 1931, the Texas Company issued its check to Wolfe for $62,366.96, in payment of 17/36ths of 1/8th of the oil sold to it. On December 26, 1931, Wolfe sent the Texas Company a copy of the stipulation disposing of the Fixico case. On December 30, 1931, the Texas Company issued its check to Wolfe for $14,674.54 in payment for 1/9th of 1/8th of the oil sold to it, and forwarded it with a letter which stated it was in full payment of the balance due Wolfe for oil received by it from the lease. Wolfe accepted and cashed the checks.

On May 10, 1932, Wolfe commenced this action in the District Court of Oklahoma County, Oklahoma, against the Texas Company to recover interest on the value of the royalty oil sold and run to the Texas Company by the Amerada. The action was duly removed to the District Court of the United States for the Western District of Oklahoma.

In his petition, Wolfe set up the making of the lease, the assignment thereof to the Amerada and further alleged:

"That * * * about December 1, 1926, said Amerada Petroleum Corporation, under the terms of said lease, entered upon and commenced the production of oil by drilling wells on said land, and from that time to the time of filing this suit has produced and sold from said land a large amount of crude oil; that of the crude oil produced and sold from said land by the Amerada Petroleum Corporation, the defendant, The Texas Company, a corporation, received, obtained, took and run crude oil in the months beginning with December, 1926, to and including the month of February, 1930, of the value and price of at least $1,089,246.07; that at least 7/12 of 1/8 of said oil belonging to this plaintiff, and was delivered to the pipe line of said defendant along with the 7/8 portion of the Amerada Petroleum Corporation, and was taken, received, retained, and used by said defendant, by reason of which said defendant impliedly promised and agreed to pay this plaintiff the value thereof, at the time the same was so taken and received, parts of which was thereafter paid by defendant to plaintiff, as hereinafter stated; that the value of 7/12 of 1/8 of said total sum thereof amounts to $79,424.25, which was due and owing to this plaintiff by said defendant, as the said oil was received and run by said defendant, together with interest thereon at the rate of 6% per annum on the said proportion due this plaintiff from the time said oil was taken and received by defendant, until paid, which interest from the end of each month at the rate of 6% per annum to January 4, 1932, amounts to the sum of $18,060.42. That during all of said time the defendant has had the use of said money and has detained the same and deprived this plaintiff of the use thereof. That on or about December 3, 1931, said defendant paid the plaintiff a part of said principal sum, amounting to $62,366.96; that on or about January 4, 1932, said defendant paid the plaintiff on said principal sum, the amount of $14,674.54, both payments amounting to a total of $77,041.50, but has refused and failed to pay the plaintiff the interest due thereon to January 4, 1932, at the rate of 6% per annum, from the end of each month during said period, aforesaid, which interest amounts to the sum of $18,060.42, as aforesaid, which is due and owing by said defendant to this plaintiff."

The difference between the principal amount claimed and the amount paid was due to a deduction of 3% for gross production taxes paid by the Texas Company which deduction Wolfe now concedes to be proper.

The proof established and the trial court found there was a well-defined usage generally adopted by those engaged in the business of producing, marketing or purchasing crude petroleum oil in Oklahoma, giving the producer of oil under a lease, where the lessor fails either to provide storage for the royalty oil or to sell the same, authority as agent of the lessor, to sell the royalty oil along with the working interest oil, at the posted price and on the customary terms, and giving the purchaser, where the title of the lessor is not merchantable, the right to withhold payment without liability for interest until an abstract has been furnished showing merchantable title in the lessor and a division order has been executed and delivered by the lessor.

From a judgment for the Texas Company Wolfe has appealed.

■ Parties to a contract are presumed to know a well-defined trade usage generally adopted by those engaged in the business to which the contract relates.[1]

■ Persons, who enter into a contract in the ordinary course of business, unless the terms of the contract indicate a contrary intention, are presumed to have incorporated therein any applicable, existing general trade usage relating to such business.[2]

[1] Ross v. Northrup, King & Co., 156 Wis. 327, 144 N.W. 1124, 1128; A. J. Tower Co. v. Southern Pac. Co., 184 Mass. 472, 69 N.E. 348; Cormier v. H. H. Martin Lumber Co., 98 Wash. 463, 167 P. 1105, 1106; Miller v. Germain S. & P. Co., 193 Cal. 62, 222 P. 817, 819, 32 A.L.R. 1215; Plover Savings Bank v. Moodie, 135 Iowa, 685, 110 N.W. 29, 31, 113 N.W. 476; Ankeny v. Young Bros., 52 Wash. 235, 100 P. 736, 738; Western Petroleum Co. v. Tidal Gasoline Co. (C.C.A. 7) 284 F. 82, 84; Silverstein v. Michau (C.C.A. 2) 221 F. 55, 56; Williston on Contracts, vol. 2, § 661.

[2] Cherokee Grain Co. v. Elk City Flour Mills Co., 78 Okl. 120, 188 P. 1067, 1068; De Stefano v. Associated Fruit Co., 318 Ill. 345, 149 N.E. 284; Granette Products Co. v. Arthur H. Neumann & Co., 200 Iowa, 572, 203 N.

Under the terms of the lease, the Amerada was required to deliver the royalty oil to a pipe line. Had Wolfe provided for a pipe line connection and for the sale of the royalty oil, the Amerada could have made delivery of the royalty oil accordingly. But Wolfe failed so to provide. Neither did he provide storage facilities and request delivery of his royalty oil thereto. In fact storage on the lease in any considerable amount would not have been practical. Oil must of necessity be run when produced to avoid waste and loss.

The pipe line companies were common carriers of oil. They could not accept oil to be run through their pipe lines without the designation of a consignee. Therefore, the Amerada of necessity was required to sell the royalty oil as agent of Wolfe and designate the purchaser as the consignee. The lease imposed upon the Amerada an implied duty to market the royalty oil. We shall advert to this implied covenant more fully later in this opinion.

Under the facts, the existing trade usage and its implied duty under the lease to market the oil, we think the Amerada had implied authority to sell the Wolfe royalty oil, at the posted price and on the customary terms, as it was produced. That it did. Indeed, there was no other practical way for the Amerada to deal with royalty oil. The usual and customary terms gave the purchaser of such oil the right to withhold payment of the purchase price until an abstract showing a merchantable title and a division order executed by Wolfe were furnished.

But if Amerada did not have authority in the first instance to sell the royalty oil belonging to Wolfe, it undertook to sell it as Wolfe's agent, on the usual and customary terms and the question of ratification by Wolfe is presented.

Amerada advised Wolfe on January 29, 1927, that it was selling the oil and gave him the names of the purchasers to whom the oil was being run. On February 18, 1927, Amerada advised Wolfe the purchasers were withholding payment for the oil on account of the litigation concerning the title. Wolfe raised no objection thereto and advised Amerada he would be glad to cooperate with it in clearing the title. From February 1927 on, Amerada furnished him monthly statements showing the amount and value of the royalty oil, the purchasers to whom it was being run and the amounts run to each purchaser. Wolfe at no time in anywise objected to Amerada selling and running the royalty oil. In his letter of October 17, 1931 to the Texas Company, Wolfe recognized the sale by the Amerada to the Texas Company by requesting that payment be made in accordance with the terms of the contract of sale. Wolfe knew the purchasers were withholding payment pending litigation concerning the title and it is significant that he made no demand on the Texas Company for payment until he had been advised by Amerada that the title to one-half of his royalty interest was free of adverse claims. Again on October 26, 1931, he requested the Texas Company to pay him for that portion of his royalty oil that had been cleared of adverse claims.

In order to prevent loss the oil either had to be stored or sold as it was produced. Storage by Wolfe was not practical. It could have been done only by a large operator with adequate storage facilities. Hence it had to be sold. No oil purchaser would have purchased the oil unless it was permitted to withhold the purchase price pending the litigation respecting the title or was given an indemnity agreement to protect it against loss. The sale under the circumstances, was clearly for Wolfe's benefit.

One who with knowledge of the material facts concerning an act, done by one assuming to act as his agent without authority, voluntarily accepts the benefits flowing therefrom, thereby ratifies the act and makes it his own as though he had authorized it from the beginning.[3]

W. 935, 938, 205 N.W. 205; Rose v. Maas Bros., 147 Ark. 275, 227 S.W. 386, 387; Miller v. Germain S. & P. Co., supra; Ross v. Northrup, King & Co., supra; Hewitt v. John Week Lumber Co., 77 Wis. 548, 46 N.W. 822, 825; Steidtmann v. Joseph Lay Co., 234 Ill. 84, 84 N.E. 640, 642; Douglas & Mizell v. Ham Turpentine Co., 210 Ala. 180, 97 So. 650, 652; Robinson v. United States, 13 Wall. 363, 20 L.Ed. 653; Kockos v.

C. Itoh & Co. (C.C.A. 9) 288 F. 557, 558; C. M. McMahen & Sons v. Louisville & N. R. Co. (C.C.A. 5) 16 F.(2d) 698, 699; Alabama Chemical Co. v. International A. Corporation (C.C.A. 5) 35 F.(2d) 907, 909; Lamborn v. Blattner (C.C.A. 5) 6 F.(2d) 435, 437, 438; Williston on Contracts, vol. 2, §§ 656, 661.

3 Whitcomb v. Oller, 41 Okl. 331, 137 P. 709, 710; Chicago, R. I. & P. Ry. Co. v. Newburn, 39 Okl. 704, 136 P. 174.

[5] Silence under such circumstances that, according to the ordinary experience and habits of men, one would naturally speak if he did not consent, is evidence from which assent may be inferred.[4]

■ Knowledge requisite to ratification need not embrace every detail of the transaction. It is sufficient if the purported principal has knowledge of all the material facts.[5]

Here Wolfe knew the oil was being sold and run as it was produced; the Amerada reported to him each · month the names of the purchasers, the amount sold and run to each and the prices, and he is presumed to have known the general trade usage referred to hereinbefore. These in our opinion constituted all the material facts.

■ We conclude Wolfe by his acts and his acquiescence, ratified the sales by Amerada, if in the first instance they were unauthorized.

It follows that the payment for the royalty oil of Wolfe run to the Texas Company was not due until Wolfe furnished an abstract showing merchantable title in him and executed and delivered a division order.

■ In the absence of a contract to the contrary, interest does not begin to run on an obligation to pay money until the obligation is due and payable. Badger v. Dukes, 134 Okl. 25, 272 P. 414, 417; Morley v. Lake Shore Ry. Co., 146 U.S. 162, 168, 13 S.Ct. 54, 36 L.Ed. 925; American Iron & S. M. Co. v. Seaboard Air Line Ry., 233 U.S. 261, 265, 34 S.Ct. 502, 58 L. Ed. 949.

Counsel for Wolfe assert it is a settled rule of law that where one has detained or had the use of the property or money of another, he is obligated to pay the owner thereof, interest for the value of the use; and that a trade usage may never be set up to contravene, control or supersede a settled rule of law.

■ It is well settled that a trade usage which is contrary to a statute or which contravenes public policy is invalid and may not be invoked; but where a rule of law is of a character that the parties may make it inapplicable to their contract by express agreement, they may likewise render it inapplicable by implied agreement or by usage. Many rules of law apply only in the absence of an agreement to the contrary.[6]

176; United States F. & G. Co. v. Shirk, 20 Okl. 576, 95 P. 218, 220; Pittsburgh, C. & St. L. R. Co. v. Keokuk Bridge Co., 131 U.S. 371, 381, 9 S.Ct. 770, 33 L.Ed. 157.

4 Restatement of Law, Agency, § 94; section 9434 Okl.St.1931; Mechem on Agency (2d Ed.) vol. 1, § 453; Ellis v. Simmons (C.C.A. 5) 11 F.(2d) 596, 597; Philadelphia, W. & B. R. Co. v. Cowell, 28 Pa. 329, 70 Am.Dec. 128; Heyn v. O'Hagen, 60 Mich. 150, 26 N.W. 861, 863; Renland v. First Nat. Bank of Grass Range, 90 Mont. 424, 4 P.(2d) 488; Ankeny v. Young Bros., 52 Wash. 235, 100 P. 736, 738, 739.

5 Mechem on Agency (2d Ed.) vol. 1, § 395; Amazon Fire I. Co. v. Bond, 65 Okl. 224, 165 P. 414, 418; Thorp Oil & Specialty Co. v. Home Oil Refining Co., 79 Okl. 225, 192 P. 573, 574; Guaranty Trust Co. of New York v. Koehler (C. C.A. 8) 195 F. 669, 682; Bloomfield v. Charter Oak Bank, 121 U.S. 121, 135, 7 S.Ct. 865, 30 L.Ed. 923; Owings v. Hull, 9 Pet. 607, 629, 9 L.Ed. 246.

6 Williston on Contracts, vol. 2, §§ 655, 657, 658; Jones Commentaries on Evidence (2d Ed.) Vol. 4, § 1595; Lawson on Usages and Customs, §§ 225–248; Swift v. Gifford, Fed.Cas.No.13,696, 2 Lowell, 110; Colket v. Ellis, 10 Phila.

(Pa.) 375, 378, 379; Snowden v. Warder, 3 Rawle (Pa.) 101, 105–107; Grinman v. Walker, 9 Iowa, 426, 428, 429; Adams v. Pittsburgh Ins. Co., 95 Pa. 348, 355, 40 Am.Rep. 662. See, also, Renner v. Bank of Columbia, 9 Wheat. 581, 6 L.Ed. 166; Dickinson v. Gay, 7 Allen (Mass.) 29, 35–37, 83 Am.Dec. 656; Pickering v. Weld, 159 Mass. 522, 34 N.E. 1081, 1082; First Nat. Bank of Anadarko v. Harp, 144 Okl. 219, 291 P. 116, 119.

Mr. Williston in his work on Contracts, § 655, in part says: "Though usage may work such changes in the rule of law applicable to a situation, as the parties themselves might have brought about had they in terms so agreed, it is a general rule that 'where the incident [which it is sought to annex by proof of usage] is of such a nature that the parties are not themselves competent to introduce it by express stipulation, no such incident can be annexed by the tacit stipulation arising from usage.' This means that if an express agreement would be either in violation of public policy or forbidden effect by law, an equivalent· usage will not help the matter."

In Swift v. Gifford, supra, the court in part said: "Principles of law differ

Here the Amerada, as Wolfe's agent, sold his royalty oil to the Texas Company. The title thereto, passed to the Texas Company. It did not retain or have the use of any oil belonging to Wolfe. The amount of the purchase price set up on the books of the Texas Company did not constitute a fund belonging to Wolfe. The sole obligation of the Texas Company was to pay the purchase price when it became due under the terms of the contract of sale.

The custom here invoked, did not contravene the asserted rule of law, that where one detains or has the use of the property or money of another, he must pay legal interest for the use thereof. It fixed the time when the purchase money should become due under the contract of sale.

We know of no rule of law which makes the purchase money payable at the time of delivery of the subject matter of the sale, where the title thereto is not merchantable and the purchaser may not safely pay until the seller's title has been established. Undoubtedly the parties to a contract of sale have the right, by agreement express or implied, to fix the time when the purchase money shall be paid even though in the absence of such an agreement it would be due on delivery of the subject matter of the sale. Therefore, if such a rule exists, the parties could render it inapplicable to their contract by express agreement or impliedly by incorporating into their contract a trade usage. Such a usage would not contravene a statute nor be contrary to public policy.

Nor does such trade usage vary or contravene the express terms of the lease. The lease required the Amerada to deliver Wolfe's share of the royalty oil in a pipe line to Wolfe's credit. It is silent with respect to the sale of the royalty oil. The Amerada delivered Wolfe's share of the royalty oil in the pipe line to Wolfe's credit. But in order to perform that covenant of its lease, when Wolfe failed to sell his share of the royalty oil, it had to sell same as his agent.

In the absence of an express provision in an oil and gas lease with respect to marketing the production, there is an implied duty on the part of the lessee to make diligent efforts to market the production in order that the lessor may realize on his royalty interest.

Mr. Merrill in his work, "Covenants Implied in Oil and Gas Leases," pp. 150, 151, 152, says:

"* * * It is now settled that, in addition to the implied covenants for exploration and for development, there is an implied covenant for diligent operation of the wells and marketing of the product * * *. Since the lessor's chief return is to be secured from rents and royalties which are made dependent upon operation, the lease is said to imply that, if oil or gas is found, the wells will be operated and the product sold."

Mr. Summers in his work on Oil and Gas, § 131, p. 420, says:

"An oil and gas lease may, in general terms, expressly state that the lessee is under a duty to market the oil or gas found in the land. In the absence of such provision, there is an implied duty of the lessee to market the product, in order that the lessee may realize the principal consideration of the lease; that is, the royalties."

See, also, Cole Petroleum Co. v. United States Gas & Oil Co., 121 Tex. 59, 41 S.W. (2d) 414, 417, 86 A.L.R. 719; Strange v. Hicks, 78 Okl. 1, 188 P. 347, 350.

Counsel for Wolfe have cited and rely upon a number of authorities. It would

in their importance as well as in their origin; and while some of them represent great rules of policy, and are beyond the reach of convention, others may be changed by parties who choose to contract upon a different footing; and some of them may be varied by usage, which, if general and long established, is equivalent to a contract. Thus, in Wiglesworth v. Dallison, 1 Doug. 201, which Mr. Smith has selected as a leading case, the law gave the crops of an outgoing tenant to his landlord; but the custom which made them the property of the tenant was held to be valid."

Mr. Lawson, in his work on Usages and Customs, at section 248, says: "A usage or custom, * * *, is not invalid simply because it is different in its effect from the general principles of law applicable to the particular circumstances in its absence. But if it conflicts with an established rule of public policy which it is not to the general interest to disturb; if its effect is injurious to the parties themselves in their relations to each other; if, in short, it is an unjust, oppressive, or impolitic usage, then it will not be recognized in courts of justice, for it will lack one of the requisites of a valid custom, viz., *reasonableness*."

unduly extend this opinion to review all of them, but we shall undertake to notice those upon which counsel chiefly rely.

In Kishi et al. v. Humble Oil & Refining Company et al. (C.C.A.5) 298 F. 218; Id. (C.C.A.) 10 F.(2d) 356, Kishi, on January 4, 1922, filed a bill of complaint against Chesson, the Humble Company, and I. Lang, claiming the ownership of 10 2/3rds acres of land. The Humble Company held an oil and gas lease of the land from Chesson. The Gulf Production Company intervened, claiming under an oil and gas lease from Kishi and Lang. Japhet and Coon intervened claiming an interest in the minerals under a contract with the Gulf Company. On appeal the Court of Appeals held Kishi and Lang were owners of the land and entitled to an accounting for the oil and gas produced therefrom and remanded the cause for further proceedings. 298 F. 218.

At the time the suit was commenced, the Humble Company was operating under its lease. Shortly after the first well was brought in, the several claimants entered into an operating agreement, whereby they agreed each lessee should develop and produce under its lease and pay the royalties to those ultimately determined to be entitled thereto.

The trial court awarded Kishi, Lang, Japhet and Coon an accounting for royalties on the oil produced from January 1, 1921, to April 1, 1925, but allowed interest only from April 23, 1925. On a second appeal (10 F.(2d) 356, 357) the Court of Appeals reversed and remanded with directions to award interest from the end of each month during the accounting period, saying:

"Kishi and Lang clearly would have been entitled to interest as incident to the principal from the various times of taking oil from their land, if there had been no operating agreement. Kenton Ins. Co. v. First National Bank, 93 Ky. 129, 19 S.W. 185. They did not lose this right by the agreement, which merely provided for an accounting. Under that agreement the most that could be said for the operating companies is that they were stakeholders. They had the use of the money, because they kept it, and therefore ought to pay interest as an incident to the principal debt. If they had not wished to use the money, and thus be liable for interest, they could have deposited it in the registry of the court."

That was an action between rival claimants and rival lessees claiming under them. Under the leases the royalty was due as and when the oil was produced. By the terms of the operating agreement the lessees agreed to account for the royalties when the ownerships of the land and royalties were determined. The operating agreement apparently contained no express provision respecting payment of interest. No general custom or usage was proved.

■ This is an action between the lessor and a third person to whom the lessee acting as agent for the lessor sold the royalty oil, under an agreement that the purchase price might be withheld pending determination of adverse claims to title, without liability for interest.

In Nelson et al. v. Chicago Mill & Lumber Corporation (C.C.A.8) 76 F.(2d) 17, 23, 100 A.L.R. 87, Nelson owned a tract of timber land. He entered into a contract with the Chicago Mill & Lumber Company to sell the timber estimated at 20,000,000 feet. Between September, 1926 and May, 1931, Nelson delivered 11,200,000 feet of timber.

The Lumber Corporation was incorporated in October, 1928 and took over the assets of the Lumber Company, including the above contract.

At the time the contract was made Nelson owed the Lumber Company $43,760 and a certain bank $9,000. It was agreed that as the timber was delivered, the payments due therefor should be applied on such indebtedness. It was agreed the indebtedness due the Lumber Company should bear interest and that "all retentions" by the Lumber Company should bear interest "after the next succeeding settlement date until the same" were "applied as actual credits" or "paid to" Nelson.

In March, 1927, the St. Francis Levee Board commenced a suit against Nelson challenging his ownership of the land and timber. This suit was terminated in favor of Nelson in August, 1932.

Notwithstanding such suit, Nelson continued to deliver the timber under the contract and the Lumber Company and its successor, the Lumber Corporation applied the proceeds of the timber delivered on the indebtedness until 1929, when it was liquidated. Thereafter it withheld the proceeds of the timber delivered on the ground the title was involved in litigation. Nelson brought suit to recover interest on the pro-

ceeds withheld. The Court held the Lumber Corporation was liable for interest saying:

"The defendant could have protected itself, and likewise the fund in its hands, by paying it into court in the levee board suit or by impounding it in a depository acceptable to all parties pending the outcome of the suit. Then the defendant with some plausibility might have denied liability for interest. Apparently it held the money as its own subject to the rights of its creditors, used it, and did nothing to relieve itself of responsibility for it or from paying interest on it. The interest provision of the contract was applicable and the defendant was bound by it."

There the Lumber Corporation withheld the proceeds of the timber after it was due. Here the Texas Company made payment for the oil when it was due. There the contract provided for interest on retentions of the purchase price. Here it did not.

In Indian Territory I. Oil Co. v. Killingsworth (Okl.Sup.) 51 P.(2d) 505, the lease contained the usual clause to deliver the royalty oil, free of cost in the pipe line to the credit of the lessor and provided for the assignment of the estate or the royalty interest of the lessor and for notice thereof to the lessee. The plaintiffs purchased a portion of the royalty interest and gave notice thereof to the lessee as provided in the lease. The Carter Oil Company was purchasing the oil produced on the lease. The lessee continued to deliver the oil to the Carter without notifying it of the change in ownership and the Carter continued to pay the royalty in accordance with a division order executed prior to plaintiffs' purchase. When the lessee, after receiving such notice, delivered the oil under the existing division order to Carter, it in effect delivered it to the credit of the prior owners and was guilty of conversion. Here the lessee did not deliver the oil to the credit of anyone other than the true owners. It is true the court in that case held the custom respecting division orders could not override the terms of the lease requiring delivery of the oil in the pipe line to the credit of the lessor. But here custom is not invoked to override that provision in the lease. The oil was so delivered, but in conjunction therewith, the lessee, due to the failure of the lessor to sell the oil, was compelled to sell it as his agent.

In Shreveport-El Dorado P. L. Co. v. Bennett, 172 Ark. 804, 290 S.W. 929, the lessee undertook to sell a portion of the royalty oil not as the oil of the lessor, the true owner, but as the oil of another claimant and the court held the purchaser was guilty of conversion.

In Clark v. Slick Oil Company, 88 Okl. 55, 211 P. 496, the court held that where under the terms of an oil and gas lease, it is incumbent upon the lessee to deliver the lessor's share of the oil in the pipe line, and the lessor demands delivery of the oil in the pipe line or settlement for the oil on the basis of its delivery in the pipe line and the lessee fails and refuses to do either, it is guilty of conversion of lessor's share of the oil.

Here the Amerada delivered Wolfe's share of the oil in the pipe line in strict accord with the terms of the lease.

For the reasons indicated we think these cases are distinguishable from the instant case.

In the consideration of this case we have been aided greatly by the able opinion of the trial judge. His broad experience in the field of the law pertaining to oil and gas and his intimate knowledge of the practical problems which arise in the producing and marketing of crude petroleum oil, give added force to his conclusions.

The judgment is affirmed.