M & T, INCORPORATED and W. C. McBride-Silurian Oil Company, Plaintiffs,

v.

FUEL RESOURCES DEVELOPMENT COMPANY, Defendant.

Civ. A. No. 79–K–322.

United States District Court, D. Colorado.

July 13, 1981.

R. Brooke Jackson, William W. Maywhort, Holland & Hart, Denver, Colo., for plaintiffs.

Marsha K. Wightman, Richard W. Bryans, Kelly, Stansfield & O'Donnell, Denver, Colo., for defendant.

## MEMORANDUM OPINION AND ORDER

KANE, District Judge.

Jurisdiction of this diversity case is admitted by the parties. It is a contract case concerning development and operation of oil and gas leases in the Johnny Moore Area in Jackson County, Colorado and concerns the pivotal question of when a party may, as they say in the trade, "go non-consent." M & T and McBride have sued to recover the unpaid balance of Fuelco's share of the costs, amounting to $150,927, incurred in the drilling of an oil well known as No. 1–25 Unit Well. The theory of recovery is based upon express and implied agreements among the parties, or their predecessors in interest, as well as upon the doctrine of estoppel. Plaintiffs also ask for attorney fees, pre-judgment interest and costs.

The parties have stipulated to the following facts:

1. M & T Incorporated ("M & T") is a corporation incorporated in Nevada with its principal headquarters and place of business in San Francisco, California.

2. W. C. McBride-Silurian Oil Company ("McBride") is a corporation incorporated in Delaware with its principal headquarters and place of business in St. Louis, Missouri.

3. Fuel Resources Development Company ("Fuelco") is a Colorado corporation with its principal place of business at 1250 Fourteenth Street, P.O. Box 840, Denver, Colorado 80201. Fuelco is a wholly-owned subsidiary of Public Service Company of Colorado.

4. On May 10, 1973, Fuelco, McBride and certain third parties entered into two written agreements, one entitled "Agreement" ("the 1973 Agreement") and the other entitled "Operating Agreement" ("the 1973 Operating Agreement").

5. The 1973 Agreement and the 1973 Operating Agreement generally concern the development of oil and gas leases of the parties to those agreements on certain lands within the Johnny Moore Area, in Jackson County, Colorado. The leaseholds subject to those agreements ("the Johnny Moore Leaseholds") are set forth in Exhibit A to the 1973 Agreement.

6. As of May 10, 1973, the Johnny Moore Leaseholds were owned by the following entities and in the following percentages:

McBride—37.5%

C. F. Braun & Company—37.5%

Antares Oil Corporation—9.375%

Franklin, Aston & Fair, Inc.—12.5%

Minerals, Ltd.—3.125%

7. Fuelco and McMoRan Exploration Company each earned a 25% ownership interest in the Johnny Moore Leaseholds, by sharing equally certain costs of drilling the first well on the leaseholds, which well was drilled during July through December 1973.

8. The well referred to in Stipulation No. 4(a)(7) was the "test well" under paragraph 3 of the 1973 Agreement and paragraph 7 of the 1973 Operating Agreement. It was known as the 25–1 State Well.

9. Fuelco served as the "operator" with respect to the drilling of the 25–1 State Well.

10. Immediately after Fuelco and McMoRan Exploration Company earned their 25% interests in the Johnny Moore Leaseholds, the ownership in said leaseholds became the following:

Fuelco—25.0%

McBride—18.75%

C. F. Braun & Company—18.75%

Antares Oil Corporation—4.6875%

Franklin, Aston & Fair, Inc.—6.25%

Minerals, Ltd.—1.5625%

McMoRan Exploration Company—25.0%

11. In 1974, Fuelco, McBride, McMoRan Exploration Company, C. F. Braun & Company, Antares Oil Corporation, Franklin, Aston & Fair, Inc., and Minerals, Ltd. drilled their second Johnny Moore well, which well is commonly referred to as the 42–26 State Well.

12. The ownership interests at the time of the drilling of the 42–26 State Well were the same as those set forth in Stipulation No. 4(a)(10), except that McMoRan's interest was 12.5% and Bridger Petroleum Corporation held an interest of 12.5%.

13. The operator with respect to the drilling of the 42–26 State Well was McBride.

14. On November 4, 1974, McBride made a non-consent election with respect to the 42–26 State Well; that is, McBride elected to decommit itself from participation in any expenditures which might be incurred in connection with the 42–26 State Well, after the non-consent point.

15. Following McBride's non-consent election with respect to the 42–26 State Well, Fuelco became the operator thereof.

16. McMoRan Exploration Company subsequently elected to go non-consent with respect to further operations on the 42–26 State Well.

17. Following the non-consent elections by McBride and McMoRan, the ownership interests in the 42–26 State Well were as follows:

Fuelco—40.5246%

McBride—0%

C. F. Braun & Company—28.8662%

Antares Oil Corporation—5.5591%

Franklin, Aston & Fair, Inc.—7.8125%

Minerals, Ltd.—1.8530%

Bridger Petroleum Corporation—15.3846%

McMoRan Exploration Company—0%

18. The participants in the drilling of the 42–26 State Well shared the costs and expenses incurred in the drilling of such well in proportion to their ownership interests at the time such costs and expenses were incurred.

19. In 1976, M & T acquired the entire interest of the parties to the 1973 Agreement and the 1973 Operating Agreement, or their successors in interest, in the Johnny Moore Leaseholds, except the interests of Fuelco and McBride.

20. In 1977, M & T, McBride and Fuelco agreed to attempt to establish a "federal unit" for the purpose of assisting them in the development of their leasehold interests on an approximately 4000-acre portion of the Johnny Moore Leaseholds.

21. One advantage of utilization is that leases within an approved unit can be continued in effect beyond expiration of their terms, by reason of qualifying unit production or exploration operations conducted in accordance with the unit agreements.

22. On July 26, 1977, M & T, McBride and Fuelco entered into two written agreements concerning federal utilization of the Johnny Moore Leaseholds: (a) Unit Agreement for the Development and Operation of the Johnny Moore Unit Area ("the Unit Agreement"); and (b) Unit Operating Agreement ("the Unit Operating Agreement").

23. Before a federal unit can become effective, it must be approved by the United States Geological Survey ("USGS"). On December 16, 1977, the USGS approved the federal unit, as described in the Unit Agreement and the Unit Operating Agreement. The Unit Agreement therefore became effective on that date.

24. The oil and gas leases which were subjected to the 1973 Agreement and the 1973 Operating Agreement and which were located within the unit boundaries remained in force after the execution of the Unit Agreement and the Unit Operating Agreement. Some of these oil and gas leases remain in force on the present date.

25. M & T, McBride and Fuelco did not expressly agree that the 1973 Agreement and the 1973 Operating Agreement would terminate upon execution of the Unit Agreement and the Unit Operating Agreement.

26. From July through December 1977, the third Johnny Moore well was drilled.

27. The well referenced in Stipulation No. 4(a)(26) is variously referred to as the 1–10 Unit Well, the 1–10 Federal Well or the No. 1–10 Well ("the 1–10 Unit Well").

28. The 1–10 Unit Well was located within the boundary of the Johnny Moore federal unit.

29. M & T served as the operator with respect to the drilling of the 1–10 Unit Well.

30. The 1–10 Unit Well failed to qualify as the "test well" under the Unit Agreement, because it was not drilled at an approved location.

31. The parties shared the expenses of the 1–10 Unit Well as follows: Fuelco—25%; McBride—18.75%; and M & T—56.25%.

32. Subsequent to the drilling of the 1–10 Unit Well, M & T, McBride and Fuelco considered several possible well locations and tentatively agreed to drill another well at a site proposed by Fuelco, subject to the approval of such location by the USGS.

33. The USGS approved the site referenced in Stipulation No. 4(a)(32), in March, 1978.

34. The well at the site referenced in Stipulation No. 4(a)(32) is commonly known as the 1–25 Unit Well.

35. The 1–25 Unit Well is the "test well" under paragraph 9 of the Unit Agreement, and is the "initial test well" under Article 3 of the Unit Operating Agreement.

36. M & T served as the operator with respect to the drilling of the 1–25 Unit Well.

37. The 1–25 Unit Well was drilled over a period commencing April 23, 1978, and concluding September 14, 1978.

38. At the time of commencement of drilling operations for the 1–25 Unit Well, unitized substances capable of being produced in paying quantities had not been discovered in the Johnny Moore Unit Area.

39. On July 14, 1978, Fuelco delivered to M & T a letter, under which Fuelco claimed to make a non-consent election effective at the exact point at which the estimated drilling costs set forth in a document entitled "Authority for Expenditure" or "AFE" for the 1–25 Unit Well had been spent.

40. Prior to delivery of the July 14, 1978 letter, Fuelco did not notify M & T or McBride that it was going to make a non-consent election under the terms of the Unit Operating Agreement.

41. On July 14, 1978, the 1–25 Unit Well had reached a depth of approximately 5,700 feet.

42. At the time of Fuelco's withdrawal, unitized substances capable of being produced in paying quantities had not been discovered in the Johnny Moore Unit Area.

43. Following Fuelco's departure, M & T and McBride continued drilling the 1–25 Unit Well.

44. M & T and McBride agreed to terminate drilling of the 1–25 Unit Well at a total depth of 9,401 feet.

45. The 1–25 Unit Well penetrated the Dakota and Lakota formations.

46. Prior to the drilling of the 25–1 State Well, the 42-26 State Well, the 1–10 Unit Well and the 1–25 Unit Well, the operator prepared and submitted to the other parties an "Authority (or Authorization) for Expenditure," or "AFE." Each of these AFE's was approved by all parties which owned portions of the Johnny Moore Leaseholds at the time.

47. Fuelco is engaged in the business of exploring for oil and gas and is familiar with oil and gas operations in the Rocky Mountain Area.

The 1–10 Unit Well referred to in the stipulated facts was completed as a producing well, although the completion occurred in a shallower geologic formation than anticipated and its production has been modest.

After the completion of the 1–10 Unit Well, M & T, McBride and Fuelco agreed to drill another well at a site proposed by Fuelco, subject to the receipt of the requisite federal approval of that site as the "test well" under the Unit Agreement and the Unit Operating Agreement. Such approval was obtained, and the 1–25 Unit Well was drilled at this site in 1978.

The instant dispute arises from the 1–25 Unit Well. The parties agreed to share drilling costs 56.25% M & T, 25% Fuelco and 18.75% McBride. This was in accord with the 1973 Operating Agreement and the course of dealing that the parties or their predecessors had followed from the 42–26 State Well forward. However, in the middle of drilling, when the pre-drilling costs estimates contained in the Authority for Expenditure, or AFE, were reached, Fuelco announced that it would cease to pay its share of the drilling costs. M & T and McBride were thereafter left to continue the drilling alone or to throw away their entire investment in the well to that point. They continued drilling until the Dakota-Lakota formations were tested, and at that point, in light of the test results and the burden of Fuelco's absence, they agreed to terminate drilling.

An AFE is a form which is widely used in the oil and gas industry when wells are drilled by multiple parties. The AFE sets forth the location of the well, its objective geological formation, an estimated depth at which that formation will be encountered, the estimated costs of drilling and completion, and miscellaneous other information. It is prepared by the "operator" of the well, and execution of the AFE by the non-operating owners of working interests in the underlying leaseholds is a written manifestation of their consent to participate in the well. It is axiomatic that drilling costs cannot be estimated with certainty and that an AFE is at best a good-faith estimate. AFE's are usually exceeded, often by very substantial amounts. This is particularly true in the North Park Basin, which includes the Johnny Moore Prospect. In drilling the 25–1 State Well, the 42–26 State Well, and the 1–10 Unit Well, the AFE estimates were all exceeded by substantial amounts.

In the oil and gas industry, it is understood and accepted that when one signs an AFE, he is committed to his proportionate share of the necessary costs in drilling to the objective specified in the AFE, unless the parties mutually agree to terminate drilling earlier or to attempt a completion at a shallower formation. The industry norms are consistent with the contracts and the parties' course of dealing with each other in the Johnny Moore Prospect.

In the instant case, the AFE reflected M & T's intention, as "operator," to drill and complete a test of the Entrada formation. The AFE further indicated M & T's belief that the objective formation would be encountered at a depth of 9,070 feet and that the "dry-hole" cost of the well would be $739,400.

Between the date of Fuelco's withdrawal and the date that drilling operations were concluded, M & T and McBride incurred expenditures in the amount of $603,708, in connection with the drilling operations on the 1–25 Unit Well, i. e., the AFE was exceeded by that amount. Of that amount, three-fourths was paid by M & T and one-fourth was paid by McBride. M & T and McBride contend that Fuelco is liable for 25% of this amount, or $150,927 plus interest.

Fuelco contends that it did not agree to pay more than its share of the AFE cost estimate, but I find that it agreed to pay its share of the costs of drilling the well to its objective or to casing point. Fuelco contends that it could withdraw its consent (go "non-consent") at the AFE estimate. I find

that it could not and that such constituted a breach of the contracts, the AFE, the parties' prior dealings, and industry custom and practice. Further, Fuelco contends that the drilling costs were exorbitant. I find that the costs were necessary and reasonable in light of the difficult drilling conditions. Further, Fuelco was informed of the problems as they were incurred and participated in finding solutions to them.

I find that plaintiffs relied on Fuelco's *participation* when they undertook the drilling of the 1–25 Unit Well and that Fuelco is estopped to deny its full participation in the drilling of the well and in its responsibility for paying its full proportionate share of the costs.

■ Fuelco's obligation to pay 25% of the costs is established in the 1973 Operating Agreement which is incorporated into the 1973 Agreement. The Operating Agreement provides in Article 3 that the costs of drilling the initial test well shall be borne by the parties "in accordance with separate agreement among themselves." I find that the "separate agreement" is the 1973 Operating Agreement. While Fuelco now contends that the 1973 Operating Agreement was terminated before the drilling of the 1–25 Unit Well, it didn't always. In fact, the true position of Fuelco in this litigation is already set out in the following document which, because of its poignancy, I quote in its entirety:

"INTER–DEPARTMENT MEMO–PUBLIC SERVICE COMPANY OF COLORADO

DATE    October 4, 1977

TO    Mr. David F. Cook    Supervisor, Engineering & Operations-Fuelco
                                      Department or Division
FROM    W. E. Miller    Land Manager-Fuelco
                                      Department or Division
ATTN.

SUBJ.    Johnny Moore Prospect Operations
              Jackson County, Colorado

Pursuant to your request of this date a cursory review of the pertinent agreements strongly indicates that the original operating agreement of May 10, 1973 prevails over the subsequently executed unit operating agreement of September, 1977 pending approval of the unit agreement by the U. S. Geological Survey. The initial farmout agreement executed simultaneously with the operating agreement takes priority over the operating agreement.

Section 5 of the original operating agreement states as follows:

'The parties (Fuelco, succeeded by McBride) . . . . . . shall be the operator of the unit area and shall conduct and direct and have *full control* of all operations on the unit area as permitted and required by, and within the limits of this agreement. It shall conduct all such operations in a good and workmanlike manner, but it shall have no liability as operator to the other parties for losses sustained, or liability incurred, except such as may result from gross negligence or breach of the provisions of this agreement.'

"Aside from granting the operator full authority and control, the operating agreement does not cover the situation of economic dissent during drilling operations short of casing point penetration. Provisions for removal of operator embody a one-year wait following change of operator and a 30-day notice period. Section 31(j) further provides that election of non-consent by any party with reference to completion operations forfeits that party's future interest and rights in the non-consent operation.

"It would appear that Fuelco has two primary choices at this stage. Fuelco could elect, due to economic hardship, to withdraw from operations of final penetration, forfeit all rights in the drill site spacing unit and expose itself to potential liability for such election. The second choice would be to thoroughly investigate the conduct of operations in the drilling of the current test well and, if sufficient justification exists, to challenge the workmanlike manner of such operations by operator, to promptly join in discussion of same with operator and other nonoperators directed toward initiating more economical operations or suspending operations pending replacement of operator. In any event, discussion of the situation with the operator prior to taking a firm stand or withdrawal is strongly recommended."

The method of allocation for the Johnny Moore wells is set forth in the 1973 Operating Agreement, paragraph 4 of which states:

Unless changed by other provisions of the [1973] Agreement, all costs and liabilities incurred in operations under this contract shall be borne and paid ... by the parties as their interests are given in Exhibit A.

Those interests are: 25% Fuelco; 18.75% McBride; 56.25% other parties [since 1976, M & T]. Paragraph 11(a) provides that when a party consents to the drilling of a well, he consents to bear his proportionate share of all necessary drilling costs to the casing point.

I find that Fuelco consented to the drilling of the 1–25 Unit Well and is thus liable for its proportionate share of all necessary drilling costs to the casing point. In March 1978, Fuelco agreed to the location of the well. In April, Fuelco signed the AFE for the well. Further, Fuelco participated fully in the unitization procedures including the drilling of the requisite test well. When the 1–10 Unit Well did not qualify as a test well, the 1–25 Unit Well was drilled and Fuelco issued its AFE.

Fuelco's contention that the AFE set a ceiling upon the expenditures to which it consented is without merit. It is novel and somewhat imaginative, but nevertheless meritless. The overwhelming weight of the evidence establishes that an AFE is nothing more than an estimate. In the drilling of the three previous Johnny Moore wells the cost estimates were exceeded yet Fuelco paid its proportionate share of the overruns. The Tenth Circuit has already ruled in *Cleverock Energy Corp. v. Trepel*, 609 F.2d 1358 (1979) that AFE's do not limit or otherwise qualify the consent given to participate in a particular drilling operation. The rule is bedded not only in law and logic, but even more so in practicality. Given the uncertainties and risks implicit in drilling ventures, the oil and gas drilling industry could not function if forced to march to the exact measure of a budget which is considered to be at best an educated guess. *See also Buttes Gas & Oil Co. v. Willard Pease Co.*, 467 F.2d 281 (10th Cir. 1972).

■ We next consider Fuelco's equally meritless assertion that it had the right to go non-consent at the time the AFE estimate was surpassed. Consent to drilling has certain limitations; it does not extend to completion attempts, deepenings or pluggings back. Typically non-consent elections can be made at those times or, usually, at the casing point. None of these events is related to the AFE estimate. Fuelco's attempt to go non-consent in the instant case was harnessed to the AFE and unrelated to any triggering event such as the casing point. The attempt to go non-consent here was in mid-phase of drilling and, as such, must be impermissible.

■ As previously indicated the testimony discloses that the drilling costs were reasonable and necessary. The drilling event was seriously affected by specific geologic and mechanical problems. Fuelco received daily reports of these problems and actively participated in formulating solutions to the problems. None of the parties to the enterprise was incompetent. In fact all were highly skilled and knowledgeable. There is no doubt that the conditions found in the North Park Basin make drilling particularly difficult. Anticipation of conse-

quent high costs and overruns of substantial amounts are the rule rather than the exception. Suffice it to say that drilling in the North Park Basin is not an appropriate activity for timid souls. Given these conditions and the acknowledged skill and expertise of the parties, I find that the costs incurred were reasonable and necessary.

The final defense of Fuelco to avoid meeting its responsibility is that the plaintiffs did not drill to the Entrada formation which was the objective of the project. Fuelco cannot be heard to complain since it dropped out when the well had reached 5,700 feet and the decision to terminate was not made by the survivors of the agreement until drilling reached 9,401 feet. Had Fuelco stayed in, a different result might be reached, but Fuelco's dropping out was itself a significant factor to be considered by the survivors when they mutually agreed to stop.

In sum, I hold that the AFE was only an estimate; that approval of an AFE is a commitment to pay one's proportionate share of all reasonable and necessary costs incurred until the objective formation or casing point is reached or until the parties mutually agree to terminate. Further I hold that an AFE gives no right to go non-consent and that the point at which a party can go non-consent, in the absence of express written agreement, is determined by industry custom and practice. *See Wolfe v. Texas*, 83 F.2d 425 (10th Cir. 1936).

IT IS THEREFORE ORDERED that plaintiffs shall have judgment against defendant in the amount of $150,927 plus prejudgment interest in accordance with 73 C.R.S. § 5–12–102 and costs including reasonable attorney fees. Entry of judgment will be stayed for at least twenty days during which the parties are to confer and determine whether they can agree on the amount payable for reasonable attorney fees. If the parties cannot agree then within the twenty day period the plaintiffs shall so notify the court. Upon receipt of such notice I shall appoint an expert pursuant to the Rules of Evidence and set the matter for hearing at which time the court-appointed expert will be called and the parties may examine him or her and present other and additional evidence as they are advised.